COLORADO COURT OF APPEALS
 2016 COA 45
 
 

 

Court of Appeals No. 14CA2178
City and County of Denver District Court No. 13CV33879 
Honorable John W. Madden, IV, Judge
 Rocky Mountain Gun Owners, a Colorado nonprofit corporation; National Association for Gun Rights, Inc., a Virginia nonprofit corporation; John A. Sternberg; and DV-S, LLC, a Colorado limited liability company, d/b/a Alpine Arms,
Plaintiffs-Appellants, 
v.
John W. Hickenlooper, in his official capacity as Governor of the State of Colorado,
Defendant-Appellee.

 
JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS
Division II
Opinion by JUDGE DAILEY
Ashby, J., concurs
Graham, J., concurs in part and dissents in part

Announced March 24, 2016

Arrington Law Office, Barry K. Arrington, Denver, Colorado, for Plaintiffs-Appellants
Cynthia H. Coffman, Attorney General, Frederick R. Yarger, Solicitor General, Matthew D. Grove, Assistant Solicitor General, Denver, Colorado, for Defendant-Appellee
Tierney Paul Lawrence, LLP, Martha M. Tierney, Denver, Colorado; Katten Muchin Rosenman, LLP, Jonathan K. Baum, Mark T. Ciani, Chicago, Illinois, for Amicus Curiae Law Center to Prevent Gun Violence
 
¶1       Plaintiffs, Rocky Mountain Gun Owners; National Association for Gun Rights, Inc.; John A. Sternberg; and DV-S, LLC (collectively, plaintiffs), appeal the district court’s judgment dismissing their complaint for failure to state a claim against defendant, John W. Hickenlooper, in his official capacity as the Governor of Colorado (the Governor). We affirm in part, reverse in part, and remand the case for further proceedings.

I. Background and Procedural History

¶2       In 2013, the Colorado General Assembly enacted gun control legislation when it passed House Bills 13-1224 and 13-1229. House Bill 13-1224 added three criminal statutes, sections 18-12301, 18-12-302, 18-12-303, C.R.S. 2015 (collectively, H.B. 131224), which banned the sale, possession, and transfer of "large-capacity ammunition magazines." House Bill 13-1229 added or amended sections 13-5-142, 13-5-142.5, 13-9-123, 13-9-124, 1812-101, 18-12-103.5, 18-12-112, and 18-12-202, C.R.S. 2015 (collectively referred to as H.B. 13-1229), which expanded mandatory background checks to recipients of firearms in some private transfers.
¶3       Plaintiffs filed a complaint challenging the constitutionality of the two bills. Specifically, plaintiffs alleged that (1) H.B. 13-1224 and H.B. 13-1229 violate the Colorado Constitution, article II, section 13, which affords individuals the right to bear arms; (2) H.B. 13-1229 is an unconstitutional delegation of executive and legislative authority; and (3) H.B. 13-1229 violates the due process and equal protection provisions of the Colorado Constitution.
¶4       The district court concluded that most of the plaintiffs had standing to challenge the laws, but that they had failed to state a claim for relief, and therefore granted the Governor’s C.R.C.P. 12(b)(5) motion to dismiss. In reaching its conclusion, the district court analyzed the House Bills under a "reasonable exercise of police powers" test rather than a higher standard of review such as intermediate or strict scrutiny.

II. Standard of Review

¶5       We review a trial court’s order granting a motion to dismiss de novo. BRW, Inc. v. Dufficy & Sons, Inc., 99 P.3d 66, 71 (Colo. 2004). A motion to dismiss for failure to state a claim tests the complaint’s sufficiency. C.R.C.P. 12(b)(5); Lobato v. State, 218 P.3d 358, 367 (Colo. 2009). In reviewing a motion to dismiss, we accept all assertions of material fact in the complaint as true and view the allegations in the light most favorable to the plaintiff. BRW, Inc., 99 P.3d at 71. A court cannot grant a motion to dismiss for failure to state a claim unless no set of facts can prove that the plaintiff is entitled to relief. Lobato, 218 P.3d at 367.
¶6       In reviewing a trial court’s judgment on the constitutionality of a statute or ordinance, we review the court’s legal conclusions de novo. Town of Dillon v. Yacht Club Condo. Ass’n, 2014 CO 37, ¶22. 
III. Plaintiffs’ Challenge to H.B. 13-1224
¶7       Plaintiffs contend that the district court erred in dismissing under C.R.C.P. 12(b)(5) their claim that H.B. 13-1224 violated the Colorado Constitution’s right to bear arms clause. We agree.

A. H.B. 13-1224

¶8       H.B. 13-1224 provides that "on and after July 1, 2013, a
person who sells, transfers, or possesses a large-capacity magazine commits a class 2 misdemeanor." § 18-12-302(1)(a). "Large-capacity magazine" is defined as "[a] fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition." § 18-12-301(2)(a)(I).
¶9       The statute also has a "grandfather provision" which allows an individual to possess a large-capacity magazine if that individual (1) owned the large-capacity magazine on July 1, 2013; and (2) maintained continuous possession of it. § 18-12-302(2)(a)(I)(II).
¶10       The statute does not apply to a variety of individuals working in their official capacity, including large-capacity magazine manufacturers or dealers, as well as certain specified individuals, government agencies, and armed forces personnel. See § 18-12302(3)(a)-(c).

B. The Standard Under Which a Claimed Violation of Colorado’s Constitutional Right to Bear Arms is Assessed

¶11       Article II, section 13 of the Colorado Constitution provides in pertinent part: "The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question . . . ."
¶12       In Robertson v. City & County of Denver, 874 P.2d 325 (Colo. 1994), the supreme court upheld a city ordinance banning assault weapons against the claim that the ordinance violated article II, section 13’s right to bear arms. In doing so, the supreme court noted that the district court had needlessly determined that article II, section 13 established a "fundamental" right:
While it is clear that this right is an important constitutional right, it is equally clear that this case does not require us to determine whether that right is fundamental. On several occasions, we have considered article II, section 13, yet we have never found it necessary to decide the status accorded that right. Rather, we have consistently concluded that the state may regulate the exercise of that right under its inherent police power so long as the exercise of that power is reasonable.
. . . .
As [prior] cases make clear, when confronted with a challenge to the validity of a statute or ordinance regulating the exercise of the right to bear arms guaranteed under article II, section 13 of the Colorado Constitution, a reviewing court need not determine the status of that right. Rather, the question in each case is whether the law at issue constitutes a reasonable exercise of the state’s police power.
This approach is in accordance with the vast majority of cases construing state constitutional provisions which guarantee an individual’s right to bear arms in self-defense.
Id. at 328-29.
¶13       The district court in the present case used the Robertson "reasonable exercise of police power" standard to evaluate plaintiffs’ challenge to H.B. 13-1224.[1] Plaintiffs assert, however, that that standard has been effectively overruled by two recent United States Supreme Court cases addressing the right to bear arms protected by the Second Amendment to the United States Constitution: District of Columbia v. Heller, 554 U.S. 570 (2008), and McDonald v. City of Chicago, 561 U.S. 742 (2010).
¶14       In Heller, the Supreme Court struck down as unconstitutional a ban on the possession of handguns, reasoning that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning [handguns] from the home . . . would fail constitutional muster." Id. at 628-29 (footnote omitted). The Court concluded that the Second Amendment "confer[s] an individual right to keep and bear arms,"[2] which, while not absolute, should be afforded no lesser protection than other fundamental rights. Id. at 595.
¶15       In McDonald, the Court considered similar laws to the District of Columbia’s ban in Heller. McDonald, 561 U.S. at 750. But the city of Chicago argued that its laws were constitutional because the Second Amendment did not apply to the States. Id. In reversing the United States Court of Appeals for the Seventh Circuit, the Court held "that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller." Id. at 791. "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." Id. at 778. Thus, the Court rejected the city’s invitation to treat the right recognized in Heller "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause." Id. at 780.
¶16       Plaintiffs assert that (1) Heller and McDonald established something that the supreme court in Robertson rejected, that is, that the right to bear arms is "fundamental" in nature; and, consequently, (2) the validity of a restriction on that right cannot be analyzed under Robertson’s "reasonable exercise of police power" test — instead, it must be analyzed under the highly exacting "strict scrutiny" standard of review. See Evans v. Romer, 882 P.2d 1335, 1341 n.3 (Colo. 1994), aff’d, 517 U.S. 620 (1996). Under the strict scrutiny standard, "[a] legislative enactment which infringes on a fundamental right . . . is constitutionally permissible only if it is ‘necessary to promote a compelling state interest’ and does so in the least restrictive manner possible." Id. at 1341 (quoting Dunn v. Blumstein, 405 U.S. 330, 342 (1972)).
¶17       We are not persuaded.
¶18       In the first instance, we do not read the part of Robertson quoted at length above as rejecting the idea that the right provided by article II, section 13 is fundamental; rather, we read that part as saying that, whether the right is fundamental or not, a restriction on the right is nonetheless subject to review under a "reasonable exercise of police power" test. 874 P.2d at 329. [3]
¶19       In the second instance, we would note:

 Not all restrictions on fundamental rights are analyzed under a strict scrutiny standard of review. See, e.g., Heller v. District of Columbia, 670 F.3d 1244, 1256 (D.C. Cir. 2011) ("The [Supreme] Court has not said, however, and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake."); State v. Cole, 665 N.W. 2d 328, 336 (Wis. 2003) ("This court has previously recognized that it need not apply strict scrutiny every time a governmental burden upon fundamental rights is implicated."); see also Denver Publ’g Co. v. City of Aurora, 896 P.2d 306, 311 (Colo. 1992) (holding that "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny" (quoting Turner Broad. Sys., Inc. v. Fed. Commc’n Comm’n, 512 U.S. 622, 642 (1994) (plurality opinion))); Watso v. Colo. Dep’t of Social Servs., 841 P.2d 299, 307 (Colo. 1992) (noting that the right to parent is "fundamental" but applying a balancing test).

 In neither Heller nor McDonald did a majority of the United States Supreme Court identify a particular standard under which the validity of restrictions on the Second Amendment’s right to bear arms would be assessed.[4]

 Other states in which the right to bear arms is recognized as a "fundamental" right under their state constitutions analyze restrictions on that right under the Robertson "reasonable exercise of police power" test. See Mosby v. Devine, 851 A.2d 1031, 1044-45 (R.I. 2004) ("Even in jurisdictions that have declared the right to keep and bear arms to be a fundamental constitutional right, a strict scrutiny analysis has been rejected in favor of a reasonableness test — ‘the proper question is whether the statute is a reasonable exercise of police power.’" (quoting Cole, 665 N.W.2d at 337)); see also State v. Comeau, 448 N.W.2d 595, 597 (Neb. 1989) ("[C]ourts have uniformly upheld the police power of the state through its legislature to impose reasonable regulatory control over the state constitutional right to bear arms in order to promote the safety and welfare of its citizens."); Bleiler v. Chief, Dover Police Dep’t, 927 A.2d 1216, 1223 (N.H. 2007) ("In light of the compelling state interest in protecting the public from the hazards involved with guns, we agree with numerous courts from other jurisdictions that the reasonableness test is the correct test for evaluating a substantive due process challenge to gun control legislation.") (citation omitted).

¶20       Ultimately, we are mindful that the instant case does not present us with a challenge to H.B. 13-1224 under the Second Amendment to the United States Constitution. Instead, it presents us with a challenge based on the Colorado Constitution, the construction and application of which are matters peculiarly within the province of the Colorado Supreme Court to determine. See People v. Schwartz, No. 291313, 2010 WL 4137453, at *3 (Mich. Ct. App. Oct. 21, 2010) (unpublished opinion) ("The recent decisions by the Supreme Court of the United States do not implicate the proper interpretation and scope of this state’s guarantee of the right to bear arms; the courts of this state are free to interpret our own constitution without regard to the interpretation of analogous provisions of the United States Constitution.").[5]
¶21       The supreme court has determined that, under the state constitution, a restriction on the right to bear arms will be upheld if it is shown to be a "reasonable exercise of the state’s police power."Robertson, 874 P.2d at 329. We are bound by the supreme court’s precedent in this regard. There may be good reason for the supreme court to alter that precedent in the future, but we are not at liberty to do so. See People v. Novotny, 2014 CO 18,
¶26 (The supreme court "alone can overrule [its] prior precedents concerning matters of state law."); see also Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").[6]
¶22       Consequently, we cannot conclude that the district court erred in using the Robertson "reasonable exercise of police power" test to assess the validity of H.B. 13-1224. Cf. People v. Sandoval, 2016 COA 14, ¶25 (holding that "article II, section 13 [of the state constitution] does not protect an individual’s right to possess a short shotgun for self-defense because the state’s prohibition of short shotguns is a reasonable exercise of its police power").

C. The Application of the Standard

¶23       We can — and do — conclude, however, that the district court erred in the manner in which it applied the Robertson test in this case. When viewed in the light most favorable to plaintiffs, their allegations stated a claim for relief attacking the constitutionality of H.B. 13-1224 sufficient to survive the Governor’s Rule 12(b)(5) motion to dismiss.
¶24       "[W]hether challenged legislation is a reasonable exercise of the state’s police power is a mixed factual and legal question." Students for Concealed Carry on Campus, L.L.C. v. Regents of the Univ. of Colo., 280 P.3d 18, 28 (Colo. App. 2010), aff’d, 2012 CO 17; see Robertson, 874 P.2d at 332-33 (examining the evidence presented to the trial court in making reasonableness determination).
¶25       In their complaint, plaintiffs alleged:

 H.B. 13-1224 bans all magazines with removable floor plates because these magazines fall into the "readily converted to accept" portion of the bill. § 18-12-301(2)(a)(I).
 Because a very large majority of detachable box magazines contain a removable floor plate, it has significantly infringed on individuals’ right to keep and bear arms.
 The "grandfather provision’s" continuous possession requirement makes it impossible for eligible large-capacity magazine owners to use the large-capacity magazine in innocent ways such as loaning the firearm to a spouse, entrusting it to a gunsmith for repair, or allowing anyone to hold or use the firearm in a functional state.

¶26       In dismissing plaintiffs’ claims, the district court concluded that plaintiffs had misapplied the plain language of the statute and, therefore, were not entitled to have the case continue. Despite the district court’s deeming the statutory language clear, it also considered two nonbinding technical guidance letters, prepared by the Attorney General upon request from the Governor, to "assist Colorado law enforcement agencies in understanding and applying portions of House Bill 13-1224." Letter from Attorney General John W. Suthers to Colorado Department of Public Safety Executive Director James H. Davis 1 (May 16, 2013) (available at https://perma.cc/43ZN-6H5Z).

¶27       In his May 16, 2013, letter, the Attorney General interpreted the phrase "designed to be readily converted to accept more than fifteen rounds of ammunition" and concluded that "a magazine that accepts fifteen or fewer rounds is not a ‘large capacity magazine’ simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds." Id. at 2. The Attorney General also interpreted the phrase "maintains continuous possession" as it related to the grandfather provision of the statute, which allowed possession of large-capacity magazines prior to the effective date of the new law so long as they were continuously possessed by the original owner. Id. The Attorney General determined that the phrase "continuous possession" "cannot reasonably be read to require continuous physical possession." Id. at 3. These clarifications were not immediately apparent from the plain language of H.B. 13-1224, hence the necessity for a clarifying interpretation.

¶28       As part of a settlement in Colorado Outfitters Association v. Hickenlooper, 24 F. Supp. 3d 1050 (D. Colo. 2014), the Attorney General prepared an additional technical guidance letter on July 10, 2013, interpreting the same provisions of H.B. 13-1224. Letter from Attorney General John W. Suthers to Colorado Department of Public Safety Executive Director James H. Davis (July 10, 2013) (available at https://perma.cc/7KB8-XMVN). In it, the Attorney General emphasized that simply because a magazine with a capacity of fifteen or fewer rounds has a removable baseplate does not prohibit possession of the magazine unless the magazine has actually been altered to accept a higher capacity. Id. The Attorney General also concluded that H.B. 13-1224 "shall be afforded its reasonable, every-day interpretation," and that continuous possession "does not require a large-capacity magazine owner to maintain literally continuous physical possession of the magazine." Id. at 1-2. This was yet another articulation of a meaning not immediately evident from reading the bill’s plain language.

¶29       In addition to the letters, the district court based its decision, in part, on the facts and reasoning set forth in Colorado Outfitters. There, the federal district court conducted a bench trial to reach its findings and conclusions. See Colo. Outfitters, 24 F. Supp. 3d at 1054. Here, the district court accepted the facts determined by Colorado Outfitters in concluding H.B. 13-1224 was a reasonable exercise of the state’s police power. However, the allegations in the complaint here also deserve testing through the crucible of factfinding. As an example, the allegation that virtually any magazine violates H.B. 13-1224 deserves a hearing.

¶30       At a minimum, the claim asserts that the magazine limits violate plaintiffs’ right to bear arms under article II, section 13 of the Colorado Constitution. That requires a factual inquiry into the reasonableness of the limits. For example, was the fifteen-round limit based upon any reasonable safety concern or was it an arbitrary number? Was the continuous possession requirement based on any reasonable safety concern? Plaintiffs are entitled to present evidence of the basis for their claim.

¶31       Thus, a de novo review of the complaint’s allegations convinces us that a claim has been stated regarding H.B. 13-1224, and it should not have been dismissed as a matter of law.

IV. Plaintiffs’ Challenge to H.B. 13-1229

¶32       Next, plaintiffs contend that H.B. 13-1229 is unconstitutional in three ways: (1) it infringes on individuals’ rights to keep and bear arms; (2) it delegates legislative and executive licensure powers to nongovernmental agents; and (3) it violates the Due Process Clause.

 

A. H.B. 13-1229

¶33       Prior to the passage of H.B. 13-1229, Colorado had laws in place governing background check requirements for firearm sales at gun shows and retail sales from firearms dealers. See § 12-26.1101, C.R.S. 2015; § 24-33.5-424, C.R.S. 2015. Before a transfer of a firearm takes place, the "Licensed Gun Dealer"7 must first transmit a request for a background check of the purchaser through the national instant criminal background check system created by the Brady Handgun Violence Prevention Act, codified at 18 U.S.C. § 922 (2012). Then, the Colorado Bureau of Investigation (CBI) gives its approval after conducting a background check of the purchaser per the dealer’s request.

¶34       H.B. 13-1229 imposes the same mandatory background check requirements on some firearm transfers between private parties. It requires a transferor of a firearm to first obtain a background check of the transferee by a licensed gun dealer, using the same process that is required for retail sales or sales at gun shows. The statute also provides a number of instances in which a background check is not required.8 See § 18-12-112(6).

B. H.B. 13-1229 Does Not Infringe on an

 Individual’s Right to Bear Arms

¶35       Unlike H.B. 13-1224, H.B. 13-1229 does not implicate a fundamental right.[9] There is little question that certain groups of persons fall outside the protections of the Second Amendment and there is little reason to suggest that the application of article II, section 13 is any different in this regard. H.B. 13-1229 simply carves out a reasonable regulation that provides a mechanism for determining whether sales of firearms qualify under the national instant criminal background check system. Colorado and federal law bar certain individuals from possessing firearms based on a history of violence, criminal prosecution, or mental condition. There is no fundamental right to possess a firearm if an individual falls within one of the barred categories. See United States v. Chovan, 735 F.3d 1127 (9th Cir. 2013) (noting Heller’s observation that felons do not have a fundamental right to bear arms); Nat’l Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 700 F.3d 185 (5th Cir. 2012) (persons under twenty-one years of age do not have a right to possess a firearm); People v. Blue, 190 Colo. 95, 104, 544 P.2d 385, 391 (1975) (possession of a weapon by a previous offender statute does not violate article II, section 13).

¶36       Here, H.B. 13-1229 imposes the same background check requirements on private firearm sales that are already required for sales at gun shows and by firearm dealers. Accordingly, H.B. 131229 does not prevent the private sale of firearms; the bill merely creates an additional step for those sales not taking place through a licensed gun dealer. This step is already in place for retail and gun show sales.

¶37       Plaintiffs argue that licensed firearm dealers will be unwilling to facilitate the background checks for the transferor and transferee. Because H.B. 13-1229 only expands the reach of the background check requirements already in place in Colorado, it does not infringe on individuals’ rights to keep and bear arms for a lawful purpose. For that reason, the district court correctly concluded that plaintiffs failed to state a claim for relief.

C. Delegation of Legislative and Executive Power

¶38       However, plaintiffs also allege that H.B. 13-1229 is an
unlawful delegation of legislative and executive power. We agree with the district court that these claims should be dismissed under C.R.C.P. 12(b)(5). We reject plaintiffs’ contention that the General Assembly has unconstitutionally delegated legislative and executive power to licensed gun dealers to make rules and decisions governing whether to facilitate private firearms transactions.

1. Legislative Delegation

¶39       Colorado divides its governmental powers into three departments: legislative, executive, and judicial. Colo. Const. art. III. The Colorado Constitution provides that "no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted." Id. The constitution vests the legislative power of the state in the General Assembly. See Colo. Const. art. V, § 1(1).

¶40       The nondelegation doctrine, which has its source in the constitutional separation of powers, prohibits the General Assembly from delegating its legislative power to some other agency or person. People v. Lowrie, 761 P.2d 778, 781 (Colo. 1988). But, "[t]he General Assembly does not improperly delegate its legislative power ‘when it describes what job must be done, who must do it, and the scope of his authority.’" People v. Holmes, 959 P.2d 406, 409-10 (Colo. 1998) (quoting Swisher v. Brown, 157 Colo. 378, 388, 402 P.2d 621, 626 (1965)).

¶41       We disagree that H.B. 13-1229 unconstitutionally delegates legislative power to licensed gun dealers. Licensed gun dealers do not have the power to make rules regarding mandatory background checks; rather, they are required to follow the same procedures in place for retail firearm transactions. The only discretion they have is to charge a fee to conduct the background check, which must not exceed ten dollars. The fact that they are not legally obligated to facilitate the sale between private parties is not a delegation of legislative power. Thus, we conclude that the district court was correct in ruling that plaintiffs failed to state an unconstitutional delegation of legislative power claim.

2. Executive Delegation

¶42       Plaintiffs also contend that licensed gun dealers are empowered by statute to exercise certain executive powers — most notably, the executive power to initiate CBI background checks. They claim that licensed gun dealers have broad discretion to investigate the backgrounds of both sides of the firearms transaction and the unreviewable discretion to determine, without standards or supervision, which private sales shall be processed by the CBI. Further, plaintiffs maintain that the legislature has made licensed gun dealers its principal agents of state enforcement to keep firearms out of the hands of criminals and to aid law enforcement.

¶43       Executive agencies and officers charged with a duty to enforce criminal laws have broad discretion in the performance of those duties. People v. Dist. Court, 632 P.2d 1022, 1024 (Colo. 1981). However, "[t]he delegation of power to determine the state of facts upon which the law operates may not . . . be left to the uncontrolled discretion of the executive or administrative officer." People v. Lepik, 629 P.2d 1080, 1082 (Colo. 1981).

¶44       We conclude that H.B. 13-1229 does not unconstitutionally delegate executive powers. Once again, the process for these transfers is no different than what is already in place for retail firearm transactions and gun show sales. Licensed gun dealers are not charged with enforcing the law; instead, they are only required to initiate the request for a background check which is then completed by the CBI. They have no discretion to determine who may have broken the law or who should be prosecuted. This does not make them the principal agent of state enforcement charged with keeping firearms away from criminals.

D. Due Process Challenge

¶45       Last, plaintiffs contend that it was error to dismiss their claim that H.B. 13-1229 violated principles of due process. We disagree.

¶46       Plaintiffs advance two primary arguments to support their claim that their due process rights are violated by H.B. 13-1229’s grant of discretion to licensed firearm dealers to decline to facilitate a background check. First, licensed firearm dealers will universally refuse to facilitate these background checks, depriving transferors and transferees of their due process right to affect a lawful firearms sale. And second, licensed firearm dealers have discretion to impose criminal liability and punishments.

¶47       We conclude that the district court did not err when it determined plaintiff failed to state a claim in this regard. First, plaintiffs point to no facts that licensed firearm dealers have refused to effectuate the transfer of firearms between two private individuals. Second, plaintiffs incorrectly rely on People v. Vinnola, 177 Colo. 405, 416, 494 P.2d 826, 831 (1972), which held that "[c]riminal liability and punishments should not be predicated upon a third party’s unfettered discretion." The licensed firearm dealers have no discretion to determine criminal liability or punishment. Instead, they merely collect the personal information necessary to allow the CBI to conduct a records search. In this regard, they have no official sanctioning function; rather, they have only a reporting function. Accordingly, plaintiffs have failed to state a due process claim for relief, and the district court was correct in dismissing that claim.

V. Conclusion

¶48       The district court’s judgment that plaintiffs failed to state a claim regarding the constitutionality of H.B. 13-1224 is reversed. On remand, that claim shall be permitted to go forward. We affirm all other aspects of the district court’s judgment.

[1] Under that test, "[a]n act is within the state’s police power if it is reasonably related to a legitimate governmental interest such as the public health, safety, or welfare." Robertson v. City & Cty. of Denver, 874 P.2d 325, 331 (Colo. 1994). 
[2] The Second Amendment of the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."
[3] We realize that our reading of Robertson is at odds with that of another division. See Trinen v. City & Cty. of Denver, 53 P.3d 754, 757 (Colo. App. 2002) (noting that the Robertson court "implicitly found that the right to bear arms is not a fundamental right"). But that division’s reading was based on the misperception that Robertson’s "reasonable exercise of the police power" test was "essentially" the same as the "rational basis test." Id. at 757-58; see also Students for Concealed Carry on Campus, L.L.C. v. Regents of the Univ. of Colo., 280 P.3d 18, 28 (Colo. App. 2010) ("Rational basis review and the reasonable exercise test are distinguishable."), aff’d, 2012 CO 17.  
[4] Lower courts tend to subject restrictions on the Second Amendment right to bear arms only to intermediate (rather than strict) scrutiny. See Alice Marie Beard, Resistance by Inferior Courts to Supreme Court’s Second Amendment Decisions, 81 Tenn. L. Rev. 673, 686 (2014) (Lower courts "usually are applying a diluted form of intermediate scrutiny."); Lawrence Rosenthal, The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control, 92 Wash. U.L. Rev. 1187, 1201 (2015) ("The vast majority of appellate decisions . . . have rejected the claim that regulations limiting the ability to keep and bear arms in common civilian use are necessarily subject to strict scrutiny . . . .").
"Intermediate" scrutiny "requires a showing that the law in question is substantially related to a sufficiently important governmental interest . . . ." Evans v. Romer, 854 P.2d 1270, 1275-76 (Colo. 1995).
[5] "This is not to say that, if the Supreme Court of the United States recognized a right under the United States Constitution that provides greater protection than an analogous clause in our Constitution, this Court would not be bound by that interpretation. Rather, we simply recognize that we would not be enforcing a right guaranteed under our constitution — we would be enforcing a right guaranteed under the federal constitution." People v. Schwartz, No. 291313, 2010 WL 4137453, at *4 n.2 (Mich. Ct. App. Oct. 21, 2010) (unpublished opinion).
[6] This is particularly true given the matters we noted "in the second instance" above.
[7] "‘Licensed gun dealer’ means any person who is a licensed importer, licensed manufacturer, or dealer licensed pursuant to 18 U.S.C. sec. 923, as amended, as a federally licensed firearms dealer." § 12-26.1-106(6), C.R.S. 2015.
[8] Such exceptions include: a transfer of an antique firearm; a transfer that is a gift or loan between immediate family members; a transfer that occurs by operation of law; temporary transfers, made in the transferee’s home, when the transferee reasonably believes that possession is necessary to prevent his or her imminent death or serious bodily injury; temporary transfers of possession that occur at shooting ranges, during a target firearm shooting competition, or while legally hunting, fishing, or target shooting; a transfer made to facilitate the repair or maintenance of the firearm; any temporary transfer while in the continuous presence of the owner; a temporary transfer for not more than seventy-two hours; and a transfer from an individual in the armed forces set to be deployed to that individual’s immediate family. § 18-12-112(6), C.R.S. 2015. 
[9] In the complaint, plaintiffs allude to an "as-applied" constitutional challenge to H.B. 13-1229 in arguing hypothetically that licensed gun dealers will refuse to facilitate the background checks for a ten dollar maximum fee. Plaintiffs surmise that the licensed gun dealers would rather sell their own inventory rather than assist a private sale. We do not address this claim because the complaint did not set forth any specific allegations to support it.
 JUDGE ASHBY concurs.
JUDGE GRAHAM concurs in part and dissents in part.
JUDGE GRAHAM, concurring in part and dissenting in part.
 
¶49       I concur with my colleagues’ disposition in Part IV of the opinion, but I respectfully dissent to Part III, which deals with the plaintiffs’ challenge to H.B. 13-1224. In light of older Colorado precedent and recent United States Supreme Court jurisprudence, I conclude that a reasonableness test cannot be applied to the fundamental right to possess a firearm for self-defense under article II, section 13 of the Colorado Constitution. I would therefore remand with directions to determine whether the prohibitions imposed by H.B. 13-1224 conflict with the text, history, and tradition of firearm regulation under article II, section 13. If they do, the law cannot stand.

I. The Protections Afforded by Article II, Section 13 are Broader and Certainly No Less Than Those Guaranteed by the Second Amendment

¶50       I believe that article II, section 13 can only be understood in the overarching context of the Second Amendment to the United States Constitution as interpreted by District of Columbia v. Heller, 554 U.S. 570 (2008), and McDonald v. City of Chicago, 561 U.S. 742 (2010). The United States Constitution’s Second Amendment provides, in pertinent part, "the right of the people to keep and bear arms, shall not be infringed." Article II, section 13 of the Colorado Constitution specifies: "The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question . . . ." That provision, at a minimum, contains the protections of the fundamental right guaranteed by the Second Amendment to the United States Constitution. There are at least two reasons this is so. 
¶51       First, Colorado cases have concluded that the Colorado Constitution provides broader protections of its citizens’ civil liberties than its federal counterpart in areas of free expression and searches and seizures. It stands to reason that the rights afforded under article II, section 13 are broader than those guaranteed by the Second Amendment. See, e.g., Tattered Cover, Inc. v. City of Thornton, 44 P.3d 1044, 1056 (Colo. 2002) (Colorado Constitution "requires a more substantial justification from the government than is required by the Fourth Amendment."); People v. Ford, 773 P.2d 1059, 1066 (Colo. 1989) (Colorado Constitution "extends broader protection to freedom of expression than does the first amendment to the United States Constitution."). Compare People v. Carbajal, 2014 CO 60, ¶¶12-15 (even a previous offender has the right to defend himself from imminent threat of harm to his person, home, or property), with Heller, 554 U.S. at 626 (even the fundamental right under the Second Amendment does not cast doubt on prohibitions against felons possessing firearms). In his brief, the Governor concedes that article II, section 13 "protects a broader class of rights than the Second Amendment . . . ." See Bock v. Westminster Mall Co., 819 P.2d 55, 59 (Colo. 1991) (clarifying that Colorado Constitution could provide greater protections than its federal counterpart).
¶52       Second, the supreme court has treated the right guaranteed by article II, section 13 as a fundamental right. City of Lakewood v. Pillow, 180 Colo. 20, 22-23, 501 P.2d 744, 745 (1972), is an example. A city of Lakewood ordinance prohibited the possession or carrying of any handgun except while in one’s own domicile or while traveling to a range, gallery, or hunting area. The supreme court overturned this ordinance, holding that it was too general in its scope because some of the prohibited activities, e.g., possessing a firearm in a place of business for purposes of self-defense, were constitutionally protected by article II, section 13. Id. Even though the supreme court saw the ordinance as a lawful exercise of the police power, the court found that the ordinance offended a fundamental liberty:
Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.
Id. at 23, 501 P.2d at 745.
¶53       Pillow did not cite but did follow the precedent established by People v. Nakamura, 99 Colo. 262, 62 P.2d 246 (1936). There, Mr. Nakamura was charged under a statute outlawing hunting or firearm possession by resident aliens. He was charged with unlawful possession of upland game and unlawful possession of a firearm. He pleaded guilty to the possession of game but raised in defense to the possession of a firearm charge his right under article II, section 13. The trial court quashed the unlawful firearm possession charge. In affirming, the Colorado Supreme Court noted that while the state was free to preserve wild game for Colorado citizens, it could not disarm any class of persons or deprive them of the rights afforded by article II, section 13.
 
¶54       I conclude that the text and history of this constitutional guarantee demonstrate that firearm possession as secured by article II, section 13 is a basic and fundamental right that is at least equal to the right afforded by the Second Amendment and that it is, in fact, likely broader and more robust. Historically, Colorado has not restricted the possession of firearms and the use of firearms that H.B. 13-1224 addresses. Jurisprudence interpreting and applying the Second Amendment should therefore be helpful in applying article II, section 13. Where a statute seeks to deprive Colorado citizens of a "right guaranteed under section 13, article 2 of the Constitution," that statute "contravenes the constitutional guaranty and therefore is void." Id. at 265, 62 P.2d at 247.
II. The Robertson Test
¶55       Agreeing with an argument advanced by the Governor, the majority concludes that because the legal issues before us are uniquely based on the Colorado Constitution and because Robertson v. City & County of Denver, 874 P.2d 325 (Colo. 1994), prescribes a reasonableness test for analyzing gun control statutes and the protections afforded by article II, section 13, we need not concern ourselves with recent United States Supreme Court decisions interpreting the Second Amendment and applying it to the states. I disagree because Robertson did not consider the question of whether the right to keep and bear arms was fundamental. Had it done so, especially in light of Heller and McDonald, I believe it would have treated the right as fundamental.
¶56       I depart from the majority’s view that Robertson applied a reasonableness test regardless of whether that right was a fundamental constitutional right. Robertson concluded that it was not necessary to determine the status of the right afforded by article II, section 13 and held that it was error for the trial court to first determine whether the gun ordinance in question implicated a fundamental right. Robertson, 874 P.2d at 331. "[W]hen confronted with a challenge to the validity of a statute or ordinance regulating the exercise of the right to bear arms guaranteed under article II, section 13 of the Colorado Constitution, a reviewing court need not determine the status of that right." Id. at 329. In his partial concurrence, Justice Vollack disagreed "with the majority’s determination that this case does not require us to decide whether the right to bear arms is a fundamental right." Id. at 339 (Vollack, J., concurring in the result). In fact, he concurred in the result because he did not believe that article II, section 13 confers a right that "has been recognized as having a value essential to individual liberties in our society." Id. (Vollack, J., concurring in the result). He "would therefore hold that the right to bear arms is not a fundamental right." Id. (Vollack, J., concurring in the result). Of course, we now know that his analysis was wrong because Heller and McDonald have held that the right to bear arms is indeed a fundamental right and McDonald decreed that it applies to Colorado. McDonald, 561 U.S. at 750, 791; Heller, 554 U.S. at 635. Importantly, it is a fundamental right that is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." McDonald, 561 U.S. at 780.
¶57       It is apparent to me that Robertson purposefully avoided considering the nature of the right to bear arms and, if it were to consider the question in light of Heller and McDonald, it would necessarily consider the right afforded by article II, section 13 to be fundamental.
¶58       We know now, in light of McDonald, that the Second Amendment right to keep and bear arms is fully applicable to the states, see id. at 748, and as the Second Amendment necessarily provides minimum protection of the right to bear arms, article II, section 13 could provide no less. Consequently, Heller and McDonald are helpful in determining whether a state statute offends article II, section 13. Thus, one can reasonably conclude that if a state statute violates the Second Amendment, a fortiori, it violates article II, section 13. As noted by Judge Kozinski, dissenting in an order denying a petition for rehearing en banc:
As guardians of the Constitution, we must be consistent in interpreting its provisions. If we adopt a jurisprudence sympathetic to individual rights, we must give broad compass to all constitutional provisions that protect individuals from tyranny. If we take a more statist approach, we must give all such provisions narrow scope. Expanding some to gargantuan proportions while discarding others like a crumpled gum wrapper is not faithfully applying the Constitution; it’s using our power as . . . judges to constitutionalize our personal preferences. 
Silveira v. Lockyer, 328 F.3d 567, 568, 569 (9th Cir. 2003) (Kozinski, J., dissenting)1.
III. Heller and McDonald
¶59       In 2008, the Supreme Court considered a ban on the possession of handguns enacted by the District of Columbia. Heller, 554 U.S. at 574. The ban prohibited the possession of a handgun except in the personal residence of the owner and required that the handgun be kept in an unloaded and inoperable status or secured with a trigger lock. Id. at 570. Even though the ban was clearly within the police power of the District of Columbia city council, the Court struck it down, reasoning that it was unconstitutional because the Second Amendment protects the right to bear arms that are typically possessed by law-abiding citizens for lawful purposes. Id. at 627-29. Heller observed that handguns, in particular, were commonly used. Id. at 625. The ordinance sought to prohibit an entire class of firearms overwhelmingly chosen by Americans for defending themselves. Id.
 
¶60       Because one of the core lawful purposes of the fundamental right afforded by the Second Amendment is self-defense, the purpose would be defeated by requiring a firearm to be kept in an inoperable condition. Id. at 630, 635. Heller reasoned that a handgun ban would not satisfy any standard of scrutiny because the Second Amendment should be afforded no lesser protection than other fundamental rights. Id. at 628-29.
¶61       McDonald took the additional step of holding "that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller." 561 U.S. at 791. There, a city of Chicago ordinance banned the possession of a handgun in the city limits without a valid registration certificate. The same ordinance barred any registration of a handgun. In holding the ordinance to be unconstitutional, McDonald made clear that the Second Amendment right to bear arms was fundamental because it was "deeply rooted in this Nation’s history and tradition" and should be accorded the same status as other rights incorporated in the Due Process Clause. Id. at 767 (citation omitted). Therefore, the guarantee is fully binding on the states. Id. at 784-85. Consequently, the Second Amendment right to bear arms is, like all other fundamental rights, fully applicable to the State of Colorado.
¶62       Our supreme court has not addressed the application of a reasonableness test to the right to bear arms in the aftermath of Heller and McDonald. However, three divisions of this court have examined this issue.
¶63       In Trinen v. City & County of Denver, 53 P.3d 754, 757 (Colo. App. 2002) (a decision by a division of this court with which the majority disagrees), the division held that the Robertson court "essentially applied the rational basis test" and "implicitly found that the right to bear arms is not a fundamental right." See also Town of Dillon v. Yacht Club Condos. Home Owners Ass’n, 2014 CO 37, ¶27 (Where an "ordinance does not implicate a fundamental right" it must bear a rational relationship to a legitimate government interest or a "reasonable relationship between the ordinance and a legitimate government objective.").
¶64       In 2010, in Students for Concealed Carry on Campus, L.L.C. v. Regents of the University of Colorado, 280 P.3d 18, 21 (Colo. App. 2010), aff’d, 2012 CO 17, a division of this court applied the Robertson reasonable exercise test in evaluating whether the statute requiring a permit to carry a concealed handgun, sections 18-12201 to -216, C.R.S. 2015, applied to universities.
¶65       Finally, in People v. Cisneros, 2014 COA 49, ¶21, the division addressed the constitutionality of section 18-18-407(1)(f), C.R.S. 2015, which outlawed the possession of a firearm in furtherance of a drug offense. Taking Heller, McDonald, and federal circuit decisions into account, the panel "conclude[d] that the fundamental right conferred under the Second Amendment is the right for law-abiding, responsible citizens to bear arms for lawful purposes." Id. at ¶30. The division reasoned that because the statute at issue only addressed unlawful conduct, it did not infringe on the Second Amendment right to bear arms for lawful purposes. Id. Further, the panel concluded that Heller did not call into question prohibitions on unlawful possession of firearms and thus saw "no reason to speculate that our supreme court would modify its holding in Robertson in light of Heller." Id. at ¶35.
¶66       Even the Governor doubts the efficacy of using a Robertson standard of reasonableness in dealing with what is now, in my view, a fundamental right guaranteed by the Second Amendment. The Governor’s brief urges us to adopt a two-part means end scrutiny test that has been applied by some federal and state courts. Under this test, a court first addresses whether the challenged law burdens conduct that falls within the scope of the Second Amendment. See Colo. Outfitters Ass’n v. Hickenlooper, 24 F. Supp. 3d 1050, 1066 (D. Colo. 2014). If the challenged legislation is protected by the Second Amendment, a court then applies a level of constitutional scrutiny. The level of scrutiny is applied on a case-by-case basis depending on how severely the right has been burdened. See id. at 1065-66. Colorado Outfitters adopted a two-step approach: first the court must decide whether the challenged law impacts firearms or firearms use and, if so, "then a court must determine what level of constitutional scrutiny to apply." Id. at 1066.
¶67       Justice Breyer first discussed this test in his Heller dissent; he termed it an interest-balancing inquiry. See Heller, 554 U.S. at 689-90 (Breyer, J., dissenting). However, the Court in Heller addressed this approach and rejected it by stating: "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding ‘interest-balancing’ approach." Heller, 554 U.S. at 634. The Court further asserted that "[a] constitutional guarantee subject to future judges’ assessments of its usefulness is no constitutional guarantee at all." Id. The McDonald Court reiterated this sentiment in rejecting the argument that the "scope of the Second Amendment right should be determined by judicial interest balancing," and that "this Court decades ago abandoned ‘the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights.’" McDonald, 561 U.S. at 785-86 (quoting Malloy v. Hogan, 378 U.S. 1, 10-11 (1964)).
¶68       McDonald also rejected any notion that an affront to the fundamental right to bear arms could be tested on a reasonableness standard when it disapproved the argument that state and local governments should be free to adopt "any gun control law that they deem to be reasonable." Id. at 783-84. Of course, the arguments raised by the proponents of the gun legislation in both Heller and McDonald stressed that the gun ban ordinances were reasonable exercises of police power.
¶69       I am therefore compelled to conclude that the development of the law regarding the right to bear arms after Robertson casts doubt on the propriety of using a reasonable exercise test where a fundamental right is involved.
IV. How Should We Apply Article II, Section 13 in Light of Heller and McDonald?
¶70       Here, we are concerned with a law that purports to control the type of integral parts of a firearm one may possess and how they are possessed. H.B. 13-1224 provides that "on and after July 1, 2013, a person who sells, transfers, or possesses a large-capacity magazine commits a class 2 misdemeanor." § 18-12-302(1)(a), C.R.S. 2015. "Large-capacity magazine" is defined as "[a] fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition." § 18-12-301(2)(a)(I), C.R.S. 2015. Those who purchased a large-capacity magazine prior to the effective date of the statute must maintain "continuous possession" of it. § 18-12-302(2)(a)(I) & (II). The two-step test applied by Colorado Outfitters was adopted by United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010). However, in Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011) (Heller II), Judge Kavanaugh addressed this test in his dissent and pointed out that such a test was contrary to the Supreme Court’s holding in Heller because Heller (and McDonald) relied "wholly on text, history, and tradition." Heller II, 670 F.3d at 1276 (Kavanaugh, J., dissenting). Judge Kavanaugh explained that the Court in Heller flatly rejected an interest-balancing approach suggested in the dissent of Justice Breyer.
We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding ‘interest-balancing’ approach. The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges’ assessments of its usefulness is no constitutional guarantee at all.
Heller, 554 U.S. at 634.
¶71       Judge Kavanaugh also argued that McDonald’s rejection of any inquiry into the analysis of "costs and benefits" of firearms restrictions emphasizes the Court’s rejection of a strict or intermediate scrutiny approach to gun regulations. Heller II, 670 F.3d at 1278 (Kavanaugh, J., dissenting). When an analysis is based on weighing the costs and benefits of firearms restrictions, it is engaged in balancing — something the Court in Heller explicitly u8nrejected. If the proposed restriction affects the core right protected by the Second Amendment, it is unconstitutional. To determine whether a gun ban or regulation implicates that core right, one uses text, history, and tradition to determine whether such restrictions are longstanding and, thus, consistent with the Second Amendment. Id. at 1285 (Kavanaugh, J., dissenting). And Judge Kavanaugh adds the qualification that, even where a court might reject such a test, at a minimum it should adopt a strict scrutiny review. Id. at 1290-91 (Kavanaugh, J., dissenting).
¶72       Judge Kavanaugh’s approach was approved in Gowder v. City of Chicago, 923 F. Supp. 2d 1110, 1113 (N.D. Ill. 2012). There the court struck down a Chicago ordinance requiring a Chicago firearm permit before one could legally possess a firearm for self-defense. "[A]ny attempt to dilute or restrict a core constitutional right with justifications that do not have a basis in history and tradition is inherently suspect." Id. at 1122-23. Additionally, at least one commentator proposes an adoption of the Kavanaugh approach to analyzing Second Amendment issues. Lindsay Colvin, Note, History, Heller, and High-Capacity Magazines: What Is The Proper Standard of Review for Second Amendment Challenges?, 41 Fordham Urb. L.J. 1041 (2014).
¶73       Therefore, although I doubt that H.B. 13-1224 could withstand any standard of heightened scrutiny, any statute that purports to prohibit the fundamental guarantee of article II, section 13 should be challenged and presumed to be unconstitutional.
V. History, Text, and Tradition
¶74       I am unaware of any time in Colorado’s history where there has been a limitation on the magazines used in rifles or handguns. Nor am I aware of any tradition in limiting the type of possession one must have in order to legally possess a firearm or the magazine used in the firearm.2
¶75       As one commentator has explained, one of the core lawful purposes guaranteed by Heller and McDonald is the right to possess an operable firearm. David B. Kopel, The History of Firearm Magazines and Magazine Prohibitions, 78 Alb. L. Rev. 849, 852-53 (2015). The District of Columbia ban in Heller, for example, required that guns be kept locked and unloaded. 554 U.S. at 628. Heller recognized that an inoperable firearm was the same as no firearm. Id. at 628-31. Magazines are an integral part of a firearm because they feed the ammunition and allow the weapon to operate. See Kopel, 78 Alb. L. Rev. at 852-53; cf. United States v. Gonzalez, 792 F.3d 534, 537 (5th Cir. 2015) (magazine is a component of a firearm).
¶76       Magazines and firearms with greater than ten round capacity have been in use for more than 400 years. See Kopel, 78 Alb. L. Rev. at 852-53 (citing Lewis Winant, Firearms Curiosa 168-70 (2009)). Thirty-round magazines have been in use at least since 1927. Id. at 858-59. Since the 1960s, polymer-based twenty and thirty-round magazines have been commonly in use. Id. at 859. Double stack, polymer magazines have been used in handguns and rifles since 1979, increasing handgun capacity up to twenty-one rounds. Id. at 863.
¶77       In addition, as explained by Professor Kopel, "the vast majority of magazines today have a removable baseplate," allowing it to be "disassembled for cleaning," making it possible for owners to add "after-market extenders," thus increasing the capacity of the magazine. Id. H.B. 13-1224, in effect, bans most—if not all —magazines since it bans any magazine that can be easily converted to expand its capacity. Recognizing this intrinsic flaw in the statute, the Attorney General has attempted to resuscitate the law with "technical guidance" that removable floor plates do not render a magazine easily convertible, although there is no factual basis for that assumption. See Letter from Attorney General John W. Suthers to Colorado Department of Public Safety Executive Director James H. Davis (May 16, 2013) (available at https://perma.cc/43ZN-6H5Z); Letter from Attorney General John W. Suthers to Colorado Department of Public Safety Executive Director James H. Davis (July 10, 2013) (available athttps://perma.cc/7KB8-XMVN).
¶78       Historically (until H.B. 13-1224) there have been no
regulations in Colorado limiting the capacity of ammunition magazines. "[T]he historical evidence of the key periods [in United States history] strongly suggests that magazine bans are unconstitutional." Kopel, 78 Alb. L. Rev. at 870.
¶79       Concerning possession, there have been no regulations (until H.B. 13-1224) prescribing how one could possess, or for that matter transfer to heirs, large-capacity magazines once the chain of possession is broken. Yet this new regulation, founded on principles of safety, seeks to do just that. And this regulation is so vague that it requires the support of the Attorney General to explain its meaning with questionable letters of clarification. See Letter from Attorney General John W. Suthers (May 16, 2013); Letter from Attorney General John W. Suthers (July 10, 2013).
¶80       Saving this statute, as is exemplified by the decision in Colorado Outfitters, requires a court to balance the interests of the state against the interest of the citizen. As McDonald noted: "In Heller . . . we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785.
¶81       Consequently, like the majority, I would also direct the district court to reinstate that portion of the plaintiffs’ complaint alleging the unconstitutionality of H.B. 13-1224 and to proceed with a hearing on the claim, but I would advise the district court on remand to address the question of whether and to what extent H.B. 13-1224 impacts the fundamental guarantee represented in article II, section 13. To the extent that it does, I would hold the law to be unconstitutional. 

[1] Judge Kozinski also noted that "[t]he prospect of tyranny may not grab the headlines the way vivid stories of gun crime routinely do. But few saw the Third Reich coming until it was too late. The Second Amendment is a doomsday provision, one designed for those exceptionally rare circumstances where all other rights have failed — where the government refuses to stand for reelection and silences those who protest; where courts have lost the courage to oppose, or can find no one to enforce their decrees. However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once." Silveira v. Lockyer, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting).
[2] There is a history of outlawing dangerous weapons or modified firearms such as sawed off shotguns. Cf. People v. Sandoval, 2016 COA 14, ¶25.