# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-40344

United States Court of Appeals
Fifth Circuit

**FILED**

June 23, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee

v.

ARTURO GONZALEZ, also known as Jay,

　　　　Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, SMITH, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Perhaps no firearm has attained the level of notoriety enjoyed by the AK-47. Developed in the Soviet Union by Mikhail Kalashnikov (thus the "AK" name, which stands for "Автомат Калашникова" or "Automatic Kalashnikov"), it was first used in the late 1940s by the Red Army and soon thereafter by the armies of Soviet satellites. In the six decades since, its low cost, ease of use, and reliability have made the gun a staple in conflicts across the globe. Mexico has proven no exception, as the AK-47 has become popular among the drug cartels that operate on both sides of the border. Its Mexican nickname—"cuerno de chivo," or "goat's horn"—comes from the gun's unique

No. 14-40344

appearance when attached to its curved magazine. *See generally* C.J. CHIVERS, THE GUN (2010) (chronicling the history of the AK-47).



The magazine or "goat's horn" →

That magazine rests at the center of the dispute in this case. We must decide whether a magazine is a "component" of the AK-47 for purposes of laws prohibiting the unlicensed export of firearms and certain related items.

The problem of limited ammunition capacity has plagued rifles since their invention centuries ago. The earliest rifles fired a single shot, leaving the user vulnerable during reloading. Numerous inventions have sought to eliminate this problem. But from repeating rifles to clips,[1] none has proved as effective as the magazine. *See generally* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALBANY L. REV. 849 (2015).

Magazines come in a variety of shapes, capacities, and types, but detachable "box" magazines have become the modern standard. A detachable box magazine stores cartridges in a column and attaches to the firearm. As the firearm cycles, a spring compression mechanism moves the cartridges up and loads the top cartridge into the breech. At a basic level, the detachable box magazine serves the same purpose as its predecessors: it makes it

---

[1] "Magazines" and "clips" are often referred to interchangeably. Yet they serve different functions. A magazine generally attaches to a firearm and holds ammunition that will be fed into the chamber when the firearm is used. A clip is one step removed—it has no feeding spring, instead holding ammunition together as a unit, typically so that the ammunition can be conveniently stored or inserted into a magazine.

No. 14-40344

unnecessary to clumsily load a cartridge into the chamber every time the rifle is fired. But the unique and simple design also creates a more portable, reliable, high-capacity device that greatly enhances the capabilities of the firearm. The first AK-47s used a detachable box magazine,[2] and that is the type of magazine at issue in this case.

Arturo Gonzalez's sale of hundreds of these AK-47 magazines out of his army surplus stores in Laredo resulted in a jury convicting him of three counts of unlawful exporting. Viewed in the light most favorable to that verdict, the evidence showed that Gonzalez met with known affiliates of Mexican drug cartels and sold them AK-47 magazines knowing the magazines were being taken across the border to Mexico. Among other sales, Gonzalez sold hundreds of magazines at his store four blocks from the border to a man known as "El Gordo," who paid $30,000 in cash with no receipt and "no questions asked." ROA 915. Gonzalez and his employees put the magazines into boxes, taped them shut, and arranged for their pickup by drug cartel affiliates. During one such transaction, an employee overheard El Gordo tell Gonzalez that he "was going to take them to Mexico." ROA 311. After federal agents started to investigate Gonzalez, they recorded a conversation between Gonzalez and El Gordo in which Gonzalez expressed fear about government surveillance. Multiple witnesses, including an undercover agent, offered additional testimony that Gonzalez knew the magazines were headed to Mexico. The State Department had not issued Gonzalez a license to export firearm components.

---

[2] *See Enemy Threat Weapons B2A2177*, U.S. MARINE CORPS at 5 (No Date), *available at* http://www.usmcofficer.com/wp-content/uploads/2014/02/Enemy-Threat-Weapons.pdf.

3

No. 14-40344

The sole argument Gonzalez raises on appeal with respect to the guilty verdicts is that empty AK-47 magazines are not a prohibited item under the export laws. The smuggling statute under which he was convicted broadly prohibits exporting an item "contrary to any law or regulation of the United States." 18 U.S.C. § 554. The underlying law cited in Gonzalez's indictment is the Arms Control Export Act, which criminalizes the unlicensed export of items "designated by the President" as "defense articles." 22 U.S.C. § 2778(b)(2), (c). The President's designations of defense articles—promulgated as International Traffic in Arms Regulations (ITAR) by the State Department's Directorate of Defense Trade Controls—are contained in the United States Munitions List. 22 C.F.R. § 121.1. The Munitions List defines defense articles to include designated firearms and their "components, parts, accessories, and attachments." *Id.* at Category I(a), (b), (h).

Gonzalez argues that empty AK-47 magazines do not qualify as firearm components because the Munitions List does not mention assault rifle magazines in the definition of "component." It is true that the Munitions List does not specifically refer to magazines. But that is because the Munitions List is a list of categories, not specific products. For example, the Munitions List does not specifically list an AK-47 or even more generally an "assault rifle" as covered articles, but no one would doubt that an AK-47 falls within the "firearms" category and requires a license to export. The question is thus whether empty AK-47 magazines fit within the regulatory definition of "component." *See United States v. Nissen*, 928 F.2d 690, 693–94 (5th Cir. 1991) ("Any definition that could reasonably be given to the term 'sophisticated weaponry' would include the Phantom F–4 fighter aircraft"). Because Gonzalez raised this issue in a pretrial motion to dismiss the indictment, we review de novo. *See United States v. Kay*, 513 F.3d 432, 441 (5th Cir. 2007)

4

No. 14-40344

("This court reviews *de novo* the . . . denial of a motion to dismiss an indictment.").

A two-step analysis under the regulatory scheme provides a straightforward answer. The relevant State Department definitions state:

(a)  An *end-item* is a system, equipment, or an assembled article ready for its intended use. Only ammunition . . . is required to place it in an operating state.

(b)  A *component* is an item that is useful only when used in conjunction with an *end-item*.

22 C.F.R. § 120.45 (emphasis added). The relevant "end-item" here is the AK-47. *See id.*; *see also* 15 C.F.R. § 772.1 ("Examples of end items include . . . firearms."). And an AK-47 magazine is "useful" only when used in conjunction with that end-item: its sole purpose is to load cartridges into the breech so that they can be fired, increasing the firearm's ammunition capacity and rate of fire. Indeed, the "A" in AK-47 explains why the magazine is only useful for that purpose; it "automatically" loads cartridges into the chamber with only one pull of the trigger. As such, an AK-47 magazine plainly meets the State Department's definition of component. This comports with the common meaning of "component," which is "a part or element of a larger whole, especially a part of a machine or vehicle." OXFORD DICTIONARY OF ENGLISH 357 (3d ed. 2010).

As for Gonzalez's emphasis on the magazines being unloaded, ITAR's definition of "end-item" forecloses that argument by stating that "only ammunition . . . is required to place it in operating state." 22 C.F.R. § 120.45(a). The Munitions List thus covers articles that are not loaded at the time of export. That makes eminent sense. If only loaded articles were prohibited, exporters could simply send magazines and cartridges in separate containers,

5

and the recipients could combine them once the shipments arrived in the importing country.

The cases Gonzalez cites do not counsel otherwise. Our unpublished decision in *United States v. Flores* recognized only that our court had "no clear authority" (that is, no precedential decision) addressing whether the Munitions List encompasses magazines. *See* 439 F. App'x 337, 339 (5th Cir. 2011). That lack of binding authority is often dispositive in the plain-error context in which that case was reviewed. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (holding that "clear" or "obvious" error is a requirement for reversal on plain error review). *Flores* did not state that the Munitions List itself was unclear on whether magazines are "components."

The First Circuit's decision in *United States v. Zhen Zhou Wu*, which Gonzalez cited for the first time at oral argument, is also unhelpful to him. 711 F.3d 1 (1st Cir. 2013). That case involved the export of phase shifters,[3] and an instruction that the jury had to "accept without question the State Department's . . . determinations that the phase shifters were controlled by the Munitions List"[4] even though that agency determination came after the defendant's export. *Id.* at 17–19 (finding the jury instruction problematic because it relied on a State Department designation that "had [not] been made

---

[3] Phase shifters "change the phase of one of the two waves so that the waves exactly line up with one another (or, vice versa, so that waves that were previously "in phase" no longer line up with one another)." *Zhen Zhou Wu*, 711 F.3d at 11 n.2. They have a variety of military applications.

[4] In *Zhen Zhou Wu*, the Government alleged that phase shifters fell into Category XI(c) of the Munitions List, which includes "components, parts, accessories, attachments and associated equipment specifically designed or modified for the equipment in [Categories XI(a) and XI(b)]." Categories XI(a) and XI(b) cover a variety of complex electronic equipment configured for military application. *See* 22 C.F.R. § 121.1, Category XI(a), XI(b); *Zhen Zhou Wu*, 711 F.3d at 13–14 & n.5.

No. 14-40344

at the time that the defendants engaged in the charged conduct"). In this case, no jury instruction required that the jury follow the State Department determination, and the State Department had consistently answered in the affirmative when asked prior to Gonzalez's sales if the Munitions List covers magazines.[5] *Id.* at 19 (suggesting that the conviction would have stood if "the prosecution [did] persuade the jury . . . that the phase shifters really did fall within the Munitions List restrictions as those restrictions stood at the time of the defendants' exports"). Moreover, to the extent that *Wu* views the Munitions List issue as an element of the offense for the jury to decide,[6] Gonzalez never took that position either in the district court or in his appellate brief. Instead, he framed the issue as a legal determination by seeking to dismiss the indictment. *See Kay*, 513 F.3d at 441 (applying de novo review to the district court's denial of a motion to dismiss the indictment). Gonzalez has thus forfeited the argument that the jury should have decided whether the

---

[5] The responses to these inquiries are called "Commodity Jurisdiction Final Determinations," and background on that procedure is available at https://www.pmddtc.state.gov/documents/ddtc_getting_started.pdf. A search of those final determinations for "magazine" shows that the agency considered the Munitions List to cover magazines as early as 2011. *See* U.S. Dep't of State, Commodity Jurisdiction Final Determinations, http://pmddtc.state.gov/commodity_jurisdiction/determinationAll.html (last visited June 12, 2015). Gonzalez exported or attempted to export the AK-47 magazines in late 2012.

[6] The First Circuit limited its holding, stating that "our holding means that *in at least some cases involving Category XI(c) of the Munitions List*, the question of whether a particular part fell within Category XI(c) of the Munitions List at the time of the alleged export will be a question for the jury." 711 F.3d at 20 (emphasis added). It also distinguished cases from other circuits "involving government designations that juries were required to accept," on the ground that "crucially, in both cases the government designations at issue were made *before* the defendants' allegedly unlawful conduct occurred." *Id.* at 19 (emphasis in original) (citing *United States v. Hammoud*, 381 F.3d 316, 331 (4th Cir. 2004); *United States v. Spawr Optical Research, Inc.*, 864 F.2d 1467, 1468–69 (9th Cir. 1988)). Thus, even if Gonzalez had preserved this issue, *Wu*—to the extent we would agree with it—does not decide whether the Munitions List issue was a jury question in this case.

No. 14-40344

Munitions List covers the magazines that he exported, and we need not decide whether that is a question for a court or jury.

The district court therefore properly concluded that the Munitions List encompasses AK-47 magazines whether or not they are loaded with cartridges when shipped. We uphold the convictions.

That leaves Gonzalez's challenge to his sentence. The district court sentenced him to 63 months in prison, which was within the Guidelines range. That range used a base offense level of 26, which is the default level for unlawful exportation of firearms. *See* U.S.S.G. § 2M5.2(a)(1). Gonzalez contends that the offense level should have been lowered to 14 because "the offense involved only (A) non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed two, (B) ammunition for non-fully automatic small arms, and the number of rounds did not exceed 500, or (C) both." U.S.S.G. § 2M5.2(a)(2). Gonzalez argues that the magazines, if prohibited items at all, were small arms for sentencing purposes.

The problem for Gonzalez is that the district found that the lower offense level did not apply both because (1) empty magazines are not "small arms" and (2) the offense involved more than 500 rounds of ammunition. The alternative ammunition ruling was based on a relevant conduct finding that Gonzalez's export scheme also involved selling thousands of 7.62 x 39mm rounds to the same cartel affiliates that purchased the magazines. Gonzalez does not challenge the factual finding concerning the ammunition on appeal. That dooms his sentencing argument given that the ammunition finding alone prevents application of the lower offense level.

The judgment is AFFIRMED.

8