# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 19-0497

═══════════════


IN RE ACADEMY, LTD. D/B/A ACADEMY SPORTS + OUTDOORS, RELATOR


═══════════════════════════════

ON PETITION FOR WRIT OF MANDAMUS

═══════════════════════════════


**Argued October 6, 2020**


JUSTICE LEHRMANN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE DEVINE, JUSTICE BLACKLOCK, JUSTICE BUSBY, JUSTICE BLAND, and JUSTICE HUDDLE joined.

JUSTICE BOYD filed a concurring opinion.


This case arises out of the 2017 Sutherland Springs church shooting. Plaintiffs, who include victims of the shooting and their families, filed multiple suits against the retailer from which the perpetrator purchased the weapon used in the shooting. The retailer, Academy Sports + Outdoors (Academy),[1] sought to avail itself of the federal Protection of Lawful Commerce in Arms Act (PLCAA), which Congress passed to protect firearm retailers and manufacturers from certain lawsuits seeking damages arising out of the criminal conduct of third parties. Academy moved for summary judgment under the PLCAA, but the trial court denied the motion. After unsuccessfully seeking mandamus relief in the court of appeals, Academy filed a

---

[1] The named defendant in the suits is Academy, Ltd. d/b/a Academy Sports + Outdoors.

petition for writ of mandamus in this Court, arguing that the PLCAA requires dismissal of the underlying suits and that Academy lacks an adequate remedy by appeal. We hold that the PLCAA bars the lawsuits and protects Academy from continued participation in litigation. Accordingly, we conditionally grant Academy's petition for writ of mandamus.

## I. Background

On November 5, 2017, Devin Kelley entered First Baptist Church in Sutherland Springs wielding a Model 8500 Ruger AR-556 semi-automatic rifle fitted with a detachable thirty-round magazine.[2] He killed twenty-six people and injured twenty more. Kelley had purchased the rifle, which was packaged with a thirty-round magazine manufactured by Magpul Industries Corp., from an Academy store in San Antonio on April 7, 2016. As part of that sales transaction, Kelley purchased an additional Magpul thirty-round magazine, sold separately. Kelley reported a Colorado address and presented a Colorado ID when buying the rifle, prompting certain requirements imposed by the federal Gun Control Act on the sale of a firearm to an out-of-state resident. *See* 18 U.S.C. § 922(b)(3) (prohibiting such a sale unless "the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States"). Academy properly processed the required ATF Form 4473, which Kelley completed under penalty of perjury at the time of sale.[3]

---

[2] A magazine "generally attaches to a firearm and holds ammunition that will be fed into the chamber when the firearm is used." *United States v. Gonzalez*, 792 F.3d 534, 536 n.1 (5th Cir. 2015). It eliminates the need to manually load a cartridge into the chamber each time the weapon is fired and "greatly enhances the capabilities of the firearm." *Id.* at 536.

[3] ATF (Bureau of Alcohol, Tobacco, Firearms and Explosives) Form 4473, entitled "Firearms Transaction Record," is used to determine whether a potential buyer may lawfully own a gun. *Abramski v. United States*, 573 U.S. 169, 173 (2014).

Academy also ran the required background check on Kelley through the National Instant Criminal Background Check System. Although federal law disqualified Kelley from purchasing a firearm at the time of the sale—based in part on his conviction in a 2012 court-martial for assaulting his wife and stepson and his dishonorable discharge from the United States Air Force—that disqualifying information was not in the system, which authorized Academy to "Proceed" with the sale. Litigation against the Air Force for failing to collect, handle, and report the required information is ongoing in federal court. *See Holcombe v. United States*, 388 F. Supp. 3d 777, 785 (W.D. Tex. 2019).

The mandamus proceeding at issue here arises from four lawsuits filed against Academy in Texas district court by some of the survivors of the shooting and relatives of those killed.[4] In all four suits, which were consolidated for pretrial matters, the plaintiffs assert claims for negligence; negligent hiring, training, and/or supervision; negligent entrustment; and gross negligence. The claims stem from Academy's sale of the Ruger AR-556 rifle and thirty-round magazine to Kelley, a Colorado resident. The plaintiffs allege that under the Gun Control Act, the "sale, delivery, and receipt" of the weapon must have fully complied with the laws of both Texas (the state of the sale) and Colorado (the state where the purchaser resided). 18 U.S.C. § 922(b)(3). The plaintiffs further allege that, because Colorado law prohibits the sale or possession of magazines with a capacity of fifteen rounds or more (hereafter, large-capacity magazines), COLO. REV. STAT. §§ 18-12-301, -302, the rifle–magazine package that Kelley

---

[4] The four suits include *Ward v. Academy, Ltd.*, No. 2017-CI-23341 (224th Dist. Ct., Bexar County, Tex. Dec. 13, 2017); *Solis v. Academy, Ltd.*, No. 2018-CI-14368 (438th Dist. Ct., Bexar County, Tex. Aug. 3, 2018); *Braden v. Academy, Ltd.*, No. 2018-CI-23302 (408th Dist. Ct., Bexar County, Tex. Dec. 11, 2018); and *McMahan v. Academy, Ltd.*, No. 2018-CI-23299 (285th Dist. Ct., Bexar County, Tex. Dec. 11, 2018). The suits collectively involve sixteen plaintiffs.

purchased could not legally be sold in Colorado. And because the sale to Kelley violated Colorado law, plaintiffs allege, the sale in turn violated the Gun Control Act.

Academy answered with a general denial. Academy also affirmatively asserts in its answer, among other defenses, that the PLCAA bars the plaintiffs' suits and that the sale complied with Texas, Colorado, and federal law because (1) Academy processed the required federal forms and conducted the required background check, which Kelley passed; (2) the Academy employees involved in the sale to Kelley observed no behavior that would disqualify him from purchasing a firearm; (3) the Gun Control Act's restrictions on sales to out-of-state residents apply to the sale of a firearm, not the sale of a magazine; and (4) the Colorado law at issue does not apply to sales outside Colorado.

Academy filed a traditional motion for summary judgment on the ground that the PLCAA, which generally prohibits a "qualified civil liability action"—that is, an action against a seller or manufacturer of firearms and related products for damages caused by a third party's criminal conduct—forecloses the plaintiffs' suits and compels their dismissal. 15 U.S.C. §§ 7902(a) ("A qualified civil liability action may not be brought in any Federal or State court."), 7903(5)(A) (defining "qualified civil liability action"). Although the PLCAA contains several enumerated exceptions to that general prohibition, Academy asserted that none of those exceptions apply and that the PLCAA grants it immunity from the plaintiffs' suits. In response, the plaintiffs argued that two of the PLCAA's exceptions—for (1) actions against a seller for negligent entrustment and (2) actions involving a seller's knowing violation of a law applicable to the product's sale—apply and allow the lawsuits to proceed. *Id.* § 7903(5)(A)(ii), (iii).

4

The trial court held a hearing and denied Academy's motion for summary judgment. Academy moved for a permissive interlocutory appeal of the order, but the trial court denied that motion. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(d) (authorizing a trial court to permit an appeal from an otherwise unappealable order if certain conditions are met). Academy then filed a petition for writ of mandamus in the court of appeals, which denied the petition without substantive discussion. Academy now seeks mandamus relief in this Court.[5]

## II. Discussion

Mandamus relief is an extraordinary remedy requiring the relator to show that (1) the trial court clearly abused its discretion and (2) the relator lacks an adequate remedy on appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36, 138 (Tex. 2004) (orig. proceeding). We examine each prong in turn.

## A. Abuse of Discretion

A trial court abuses its discretion when it acts with disregard of guiding rules or principles or when it acts in an arbitrary or unreasonable manner. *In re Garza*, 544 S.W.3d 836, 840 (Tex. 2018) (orig. proceeding). A trial court's "failure to analyze or apply the law correctly is an abuse of discretion." *In re Am. Homestar of Lancaster, Inc.*, 50 S.W.3d 480, 483 (Tex. 2001) (orig. proceeding) (citation omitted). Here, the propriety of the trial court's order denying Academy's summary-judgment motion hinges on a legal issue: the proper interpretation and application of the PLCAA. *See Lockheed Martin Corp. v. Hegar*, 601 S.W.3d 769, 774 (Tex. 2020) (reiterating that statutory interpretation is an issue of law).

---

[5] Amicus briefs were submitted by the Texas Civil Justice League, Mr. Stephen Willeford, the National Shooting Sports Foundation, and the State of Texas.

5

In analyzing federal statutes, we apply principles substantially similar to those that govern our interpretation of Texas law. "The starting point in discerning congressional intent is the existing statutory text." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004); *see also Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019) (explaining that our goal in interpreting a statute is to effectuate legislative intent and that our most reliable guide is the statute's text). We enforce a statute according to its plain language unless doing so would lead to an absurd result. *Lamie*, 540 U.S. at 534; *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 46 (Tex. 2015). We consider statutes as a whole, reading the chosen words "in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *see also Zanchi v. Lane*, 408 S.W.3d 373, 376 (Tex. 2013). We thus begin our analysis by reviewing the structure of the PLCAA and its exceptions before turning to the applicability of the exceptions themselves.[6]

### 1. The PLCAA

In enacting the PLCAA in 2005, Congress expressly enumerated its underlying findings, including a finding that businesses "engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products . . . are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse [such] products that function as designed and intended." 15 U.S.C. § 7901(a)(5). Congress sought to avoid "[t]he possibility of imposing liability on an

---

[6] Neither the United States Supreme Court nor this Court has had occasion to interpret the PLCAA. Thus, we find guidance in the decisions of other federal and state courts but are not bound by those decisions. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) ("While Texas courts may certainly draw upon the precedents of the Fifth Circuit, or any other federal or state court, in determining the appropriate federal rule of decision, they are *obligated* to follow only higher Texas courts and the United States Supreme Court.").

entire industry for harm that is solely caused by others." *Id.* § 7901(a)(6). Relatedly, one of the PLCAA's stated purposes is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse" of those products by a third party. *Id.* § 7901(b)(1).

To address the concerns underlying the statute's enactment, the PLCAA prohibits, with six exceptions, a category of civil actions against manufacturers and sellers of firearms and ammunition products. The PLCAA's prohibition is stated succinctly: "A qualified civil liability action may not be brought in any Federal or State court." *Id.* § 7902(a). The PLCAA further directs courts to "immediately dismiss[]" any qualified civil liability action pending on October 26, 2005, the date of the statute's enactment. *Id.* § 7902(b). "Qualified civil liability action" is defined as:

> a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party.

*Id.* § 7903(5)(A). Thus, as relevant here, a qualified civil liability action is (1) a civil action (2) brought by any person (3) against a seller of a qualified product (4) for damages or other relief (5) resulting from the criminal or unlawful misuse of the product by a third party. *Id.* A "qualified product" is "a firearm . . . or ammunition . . . or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce." *Id.* § 7903(4).

7

It is undisputed that the Ruger AR-556 rifle and Magpul magazines that Kelley purchased from Academy are qualified products under the PLCAA. Nor do the parties disagree that each of the plaintiffs' suits fits within the PLCAA's general definition of a qualified civil liability action. Rather, the disagreement hinges on the applicability of two of the statute's six enumerated exceptions to what would otherwise constitute a qualified civil liability action.

Pursuant to those two exceptions, a qualified civil liability action "shall not include . . . an action brought against a seller for negligent entrustment" (the negligent-entrustment exception) or "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought" (often referred to as the predicate exception). *Id.* § 7903(5)(A)(ii), (iii).[7] We first consider the predicate exception and then analyze the negligent-entrustment exception.

---

[7] The other four exceptions are:

(i) an action brought against a transferor convicted under section 924(h) of title 18 [transfer of a firearm knowing that it will be used to commit a crime of violence or drug trafficking crime], or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;

. . . .

(iv) an action for breach of contract or warranty in connection with the purchase of the product;

(v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; [and]

(vi) an action or proceeding commenced by the Attorney General to enforce the provisions of chapter 44 of title 18 [the Gun Control Act] or chapter 53 of title 26 [the National Firearms Act].

15 U.S.C. § 7903(5)(A)(i), (iv)–(vi).

8

## 2. Predicate Exception

The predicate exception applies when the manufacturer or seller of a qualified product knowingly violates a "State or Federal statute applicable to the sale or marketing of the product." *Id.* § 7903(5)(A)(iii); *see Prescott v. Slide Fire Sols., LP*, 410 F. Supp. 3d 1123, 1139 (D. Nev. 2019) (holding that the Nevada Deceptive Trade Practices Act qualifies as a predicate statute under section 7903(5)(A)(iii)). The predicate statute at issue in the underlying suits is section 922(b)(3) of the federal Gun Control Act, which imposes criminal penalties for failure to comply with its requirements regarding the sale or delivery of a firearm to an out-of-state resident. 18 U.S.C. § 922. The parties agree that section 922(b)(3) is a statute applicable to the marketing or sale of a qualified product, but they part ways on whether Academy violated the statute such that the PLCAA's predicate exception allows the plaintiffs' actions to proceed.

Section 922(b)(3) states in pertinent part:

> (b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver—
>
> . . . .
>
> (3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located, except that this paragraph . . . shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States) . . . .

*Id.* § 922(b)(3). Thus, the Act places two conditions on the lawful sale of a "firearm" (specifically, a "rifle" or "shotgun") by a licensed dealer to an out-of-state resident: (1) the

9

transferor and transferee must meet in person "to accomplish the transfer"; and (2) the "sale, delivery, and receipt" must "fully comply with the legal conditions of sale in both" the state of the licensed dealer's place of business and the state of the transferee's residence. *Id.*

The plaintiffs argue that Academy's sale of the Ruger AR-556 rifle to Kelley did not meet the second condition, and therefore violated the Gun Control Act, because the "sale, delivery, and receipt" of the rifle did not comply with the "legal conditions of sale" in Colorado, Kelley's state of residence at the time of the transaction. *Id.* As noted, the plaintiffs rely on Colorado's prohibition against the sale of large-capacity magazines and the fact that the rifle model Kelley purchased was packaged with such a magazine to argue that the transaction could not legally have taken place in Colorado. *See* COLO. REV. STAT. § 18-12-302(1). Academy primarily responds that section 922(b)(3)'s limitations on sales to out-of-state residents apply only to the sale of a "firearm," which as statutorily defined does not include a magazine. *See* 18 U.S.C. § 921(a)(3) (defining "firearm"). Accordingly, Academy contends, the sale of the Ruger *rifle* to Kelley complied with Colorado law and, in turn, with the Gun Control Act. Whether the sale of the *magazine* complied with Colorado law is not relevant, Academy asserts, because the Gun Control Act does not apply to such a sale.

As an initial matter, we note the differences in terminology that affect the scope of the two federal statutes at issue. A "qualified civil liability action," which the PLCAA prohibits, includes an action against a manufacturer or seller of a "qualified product." 15 U.S.C. § 7903(5)(A). A "qualified product" includes a firearm, ammunition, and a component part thereof. *Id.* § 7903(4). By contrast, as the parties agree, the Gun Control Act places limitations on the sale of a "firearm," defined by both statutes as:

(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3); 15 U.S.C. § 7903(4) (incorporating section 921(a)(3)'s definition of "firearm"). Unlike a "qualified product," a "firearm" does not encompass ammunition and includes only the weapon itself and specifically enumerated component parts: frame or receiver,[8] muffler, and silencer.[9] 18 U.S.C. § 921(a)(3). A magazine is conspicuously absent from that list. *See United States v. Gonzalez*, 792 F.3d 534, 537 (5th Cir. 2015) (holding that an AK-47 magazine "comports with the common meaning of 'component'").

The plaintiffs do not appear to dispute that a magazine, in and of itself and regardless of its capacity, is not a "firearm" subject to the Gun Control Act's restrictions on sales to out-of-state residents. *See United States v. Guillen-Cruz*, 853 F.3d 768, 772–73 (5th Cir. 2017) (holding that a rifle magazine does not meet the Gun Control Act's definition of "firearm"). Nor do they argue that Colorado law bans the sale of AR-556 rifles. Instead, they argue that because the rifle Academy sold to Kelley was inseparably packaged with a large-capacity magazine, that "sale" could not have occurred legally in Colorado. The plaintiffs further argue that a "firearm" includes unlisted component parts like magazines "when they are packaged and sold together

---

[8] Federal regulations define a "firearm frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11.

[9] A "destructive device," which is separately defined in the Gun Control Act, also qualifies as a "firearm" and is not at issue here. 18 U.S.C. § 921(a)(3)(D).

11

with the weapon itself."[10]  (Emphasis omitted.)  We hold that the plaintiffs' interpretation disregards the text and structure of both the PLCAA and the Gun Control Act, which denote a clear distinction between the treatment of firearms (as that term is statutorily defined) and magazines.

First, we reject the plaintiffs' contention that the packaging of the Model 8500 rendered the Magpul magazine part of the "firearm" that is subject to section 922(b)(3)'s restrictions.  As explained, both firearms and magazines (along with other component parts) are "qualified products" subject to the PLCAA's general prohibition against qualified civil liability actions, 15 U.S.C. § 7903(4), (5)(A), but only "firearms" are subject to the Gun Control Act's restrictions on sales to out-of-state residents, 18 U.S.C. § 922(b)(3).

To support their assertion that "the term 'firearm' includes those component parts that . . . are bundled and packaged inseparably for purposes of the sale of a trigger-and-hammer skeleton," the plaintiffs rely on federal regulations that consider a firearm and its packaged component parts together for the purpose of assessing and calculating taxes.  *See* 27 C.F.R. § 53.61(b)(2), (b)(5)(ii).  That reliance is misplaced.  As used in the Gun Control Act, "'[f]irearm' is a term of art" that includes some component parts but not others.  *United States v. Broadnax*, 601 F.3d 336, 341 (5th Cir. 2010); 18 U.S.C. § 921(a)(3) (including only a frame, receiver, muffler, and silencer in the definition of "firearm").  Under the applicable statutory definition, which makes no mention of packaging, a magazine simply is not a firearm.  18 U.S.C.

---

[10] As the plaintiffs note, Academy assigns one SKU ("stock keeping unit") number and one price to the Model 8500 AR-556 and rang up the packaged product under one price when it was sold to Kelley.

§ 921(a)(3); *Guillen-Cruz*, 853 F.3d at 773 ("There is no definition in . . . § 921 that, on its face, includes rifle magazines.").

Nor can we agree with the plaintiffs' related argument that, even if the magazine was not part of the firearm Kelley purchased, the fact that the two were inseparably packaged means that the overall transaction did not comply with Colorado law and thus violated the Gun Control Act. *See* 18 U.S.C. § 922(b)(3) (requiring that "the sale, delivery, and receipt fully comply with the legal conditions of sale in both" the state where the dealer's place of business is located and the state of the transferee's residence). Again, the plaintiffs' proffered interpretation strays from the statutory text.

Section 922(b)(3)'s mandate that "the sale, delivery, and receipt" comply with state law may not be read in a vacuum. The "sale" to which the provision refers is the "sale or delivery of any *rifle*,"[11] *id.* (emphasis added), defined in pertinent part as "a weapon designed . . . and intended to be fired from the shoulder and designed . . . to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger," *id.* § 921(a)(7). And the plaintiffs point to no applicable "legal conditions of sale" *of a rifle* in Colorado (as the Gun Control Act defines "rifle"); they point only to "legal conditions of sale" *of a magazine*, which does not fit within the statutory definition of "rifle" any more than it fits within the statutory definition of "firearm."

Indeed, although the transaction between Academy and Kelley on April 7, 2016, encompassed the sale of two Magpul large-capacity magazines—one packaged as a stand-alone product and one packaged with the Ruger AR-556 rifle—the plaintiffs do not contend that the

---

[11] The provision also applies to the sale of a shotgun, which has no bearing on the issue before us.

13

sale of the stand-alone magazine along with the rifle rendered the transaction unlawful even though it could not have taken place legally in Colorado. And the statutory text does not allow us to treat the magazine packaged with the rifle any differently. Plaintiffs essentially seek to rewrite section 922(b)(3) to apply to "the sale or delivery of any rifle *and any bundled component parts*." This we cannot do.

In sum, the sale of the Ruger AR-556 rifle to Kelley complied with the legal conditions of sale in both Texas and Colorado. Because the Gun Control Act did not regulate the sale of the magazines, the Colorado law prohibiting their sale was immaterial.[12] Accordingly, we hold that Academy complied with section 922(b)(3) and thus committed no statutory violation that would give rise to the PLCAA's predicate exception. *See* 15 U.S.C. § 7903(5)(A)(iii).

### 3. Negligent-Entrustment Exception

The plaintiffs next argue that, even if the predicate exception does not apply, another PLCAA exception entitles them to pursue their negligent-entrustment claims. Specifically, the PLCAA excepts from its prohibition "an action brought against a seller for negligent entrustment." *Id.* § 7903(5)(A)(ii). The PLCAA defines "negligent entrustment" as:

> the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others.

*Id.* § 7903(5)(B). However, the PLCAA also provides that "no provision of this [statute] shall be construed to create a public or private cause of action." *Id.* § 7903(5)(C). Accordingly, courts generally apply state law on negligent-entrustment claims in evaluating whether the exception

---

[12] We need not address Academy's alternative argument that the sale of the magazines complied with Colorado law.

14

applies. *See Prescott*, 410 F. Supp. 3d at 1132–33 (noting that "[b]ecause the PLCAA does not 'create a public or private cause of action or remedy,' courts look to state law" in determining whether the negligent-entrustment exception applies (internal citation omitted)); *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1225 (D. Colo. 2015) ("Although the PLCAA identifies negligent entrustment as an exception to immunity, it does not create the cause of action. Accordingly, the claim arises under state law." (internal citation omitted)).

Academy moved for summary judgment on the ground that Texas does not recognize a cause of action for negligent entrustment based on the sale of property, and it argues that the PLCAA's negligent-entrustment exception thus does not apply. The plaintiffs disagreed, arguing that Academy's sale of the rifle to Kelley "satisfie[d] all the requisite elements of the tort of negligent entrustment under Texas law" and that a genuine issue of material fact exists as to whether Academy supplied the rifle to Kelley with reason to know that he was likely to use it in a manner involving unreasonable risk of harm. We agree with Academy. As discussed below, we have expressly declined to recognize a negligent-entrustment claim premised on a sale and recently reaffirmed our agreement with the policy reasons underlying that conclusion.

Texas law on negligent entrustment developed in the context of entrustment of automobiles, but courts have recognized the tort's application to other types of property as well, including firearms. *See 4Front Engineered Sols. v. Rosales*, 505 S.W.3d 905, 908 n.5, 909 (Tex. 2016) (citing cases, in Texas and other jurisdictions, applying the theory to "a variety of chattel"); *see also Prather v. Brandt*, 981 S.W.2d 801, 806 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (evaluating evidence supporting a claim for negligent entrustment of a firearm). In *Rush v. Smitherman*, we confirmed that "liability for negligently entrusting a vehicle

15

to an unlicensed driver is a part of the law of bailments, but *not* of the law of sales or gifts." 294 S.W.2d 873, 876 (Tex. App.—San Antonio 1956, writ ref'd) (emphasis added). We explained: "A bailor entrusts, for what he entrusts is his. But a vendor does not entrust; he sells his chattel." *Id.* at 877; *see also id.* at 878 ("As between seller and purchaser, when the accident occurred, the seller had no right to possess or control the car."). The courts of appeals have consistently followed *Rush* and held that "negligent entrustment does not apply to the sale of a chattel." *Nat'l Convenience Stores, Inc. v. T.T. Barge Cleaning Co.*, 883 S.W.2d 684, 687 (Tex. App.—Dallas 1994, writ denied); *see also, e.g.*, *Jaimes v. Fiesta Mart, Inc.*, 21 S.W.3d 301, 305 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).

The plaintiffs cite no Texas cases holding differently but note that section 390 of the Restatement (Second) of Torts (which depicts the tort of negligent entrustment),[13] unlike the previous version of the Restatement that we cited in *Rush*, clarifies that it is intended to apply to one who supplies chattel by any means, including by sale. *See Rush*, 294 S.W.2d at 875; RESTATEMENT (SECOND) OF TORTS § 390 cmt. a (AM. LAW INST. 1965). But we have not adopted this section of the Second Restatement. Further, in *F.F.P. Operating Partners, LP v. Duenez*, we reaffirmed the policy reasons underlying the tort as we *have* recognized it, noting that "the basis for imposing liability on the owner of the thing entrusted to another is that ownership of the thing gives the right of control over its use." 237 S.W.3d 680, 686 (Tex. 2007)

---

[13] Section 390 describes the tort of negligent entrustment as follows:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

RESTATEMENT (SECOND) OF TORTS § 390 (AM. LAW INST. 1965).

16

(citing W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 73 (5th ed. 1984)); *see also Atl. Indus. Inc. v. Blair*, 457 S.W.3d 511, 519 (Tex. App.—El Paso 2014) ("Without control [of the chattel] there can be no liability [for negligent entrustment]."), *rev'd on other grounds*, 482 S.W.3d 57 (Tex. 2016). Extending a common-law negligent-entrustment claim to a sale of chattel, which results in the seller's *relinquishing* control over the very thing that is subsequently used in a manner that causes harm, contradicts that reasoning.

Therefore, we agree with Academy that no viable cause of action exists under Texas law for negligent entrustment based on a sale of chattel. In turn, we hold that the plaintiffs may not rely on the negligent-entrustment exception to pursue their claims. *See Prescott*, 410 F. Supp. 3d at 1133 (applying Nevada law on negligent entrustment to determine whether the PLCAA's negligent-entrustment exception applied); *Soto v. Bushmaster Firearms Int'l*, 202 A.3d 262, 278, 283 (Conn. 2019) (holding that the plaintiffs had failed to plead a legally sufficient cause of action for negligent entrustment under Connecticut law and that the plaintiffs' action thus could not proceed under the PLCAA's negligent-entrustment exception).[14] Absent an applicable exception, the plaintiffs' suits are qualified civil liability actions that "may not be brought." 15 U.S.C. § 7902(a). Accordingly, Academy is entitled to summary judgment under the PLCAA, and the trial court abused its discretion in denying Academy's motion.

---

[14] The concurrence agrees that Texas law does not recognize a negligent-entrustment claim in the context of a sale and thus bars the claims at issue. *Post* at ___. But the concurrence opines that state law does not come into play when analyzing whether the PLCAA's negligent-entrustment exception applies. *Id.* at ___. Instead, the concurrence argues that the exception applies, and the PLCAA in turn does not foreclose the claims, so long as the allegations fall within the PLCAA's definition of negligent entrustment. *Id.* at ___; *see also Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 324 (Mo. 2016). We disagree. Because the PLCAA expressly disclaims the creation of any cause of action, and negligent entrustment is a creature of state law, state law necessarily informs the application of the negligent-entrustment exception. Absent a valid state-law cause of action, as is the case here, no cause of action exists to fall within that exception. Accordingly, we do not read the PLCAA to allow a nonexistent state-law claim to proceed. Rather, the PLCAA mandates that we look to state law.

## B. Adequate Appellate Remedy

Notwithstanding our conclusion regarding the trial court's abuse of discretion, we may grant mandamus relief only if Academy lacks an adequate remedy by appeal. *Prudential*, 148 S.W.3d at 135–36. We determine whether an adequate appellate remedy exists by weighing the benefits of mandamus review against the detriments. *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 313 (Tex. 2010) (orig. proceeding). This balancing test is necessarily a fact-specific inquiry that "resists categorization." *Prudential*, 148 S.W.3d at 136. Thus, although we have held that "mandamus is *generally* unavailable when a trial court denies summary judgment," *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 465 (Tex. 2008) (orig. proceeding) (emphasis added), that principle is not, and cannot be, absolute, *see, e.g.*, *In re United Servs. Auto. Ass'n*, 307 S.W.3d at 313 (granting mandamus relief from the trial court's order denying summary judgment where the relator was "facing a second trial on a claim that we have just held to be barred").

The following discussion in *Prudential* guides us in our evaluation of the propriety of mandamus relief:

> Mandamus review of incidental, interlocutory rulings by the trial courts unduly interferes with trial court proceedings, distracts appellate court attention to issues that are unimportant both to the ultimate disposition of the case at hand and to the uniform development of the law, and adds unproductively to the expense and delay of civil litigation. Mandamus review of significant rulings in exceptional cases may be essential to preserve important substantive and procedural rights from impairment or loss, allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments, and spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings.

148 S.W.3d at 136. Consistent with that discussion, we have recognized that "[t]he most frequent use we have made of mandamus relief involves cases in which the very act of

proceeding to trial—regardless of the outcome—would defeat the substantive right involved." *In re McAllen Med. Ctr.*, 275 S.W.3d at 465. Academy asserts that the PLCAA confers such a right, while the plaintiffs contend that the PLCAA acts as a preemption defense to liability that is adequately protected by appeal in the event that a final judgment is rendered against Academy.[15]

We begin, as ever, with the statute's text. In enacting the PLCAA, Congress primarily sought to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products . . . for the harm solely caused by the criminal or unlawful misuse of [those] products by others when the product functioned as designed and intended." 15 U.S.C. § 7901(b)(1). To implement that purpose and others, including "prevent[ing] the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce," *id.* § 7901(b)(4), protecting separation-of-powers and federalism principles, *id.* § 7901(b)(6), and preserving citizens' access to firearms for lawful purposes, *id.* § 7901(b)(2), the PLCAA mandates: "A qualified civil liability action may not be brought in any Federal or State court." *Id.* § 7902(a). Congress also mandated that any such action pending on the date of the PLCAA's enactment "be immediately dismissed." *Id.* § 7902(b).

First, we note Congress's choice of language in section 7902(a). Congress did *not* say that "no liability may be imposed in a qualified civil liability action" or that "a manufacturer or seller of a qualified product may not be held liable in a qualified civil liability action"; it said that such an action "may not be brought in any Federal or State court." We presume that this

---

[15] The Second Circuit has held that the PLCAA's bar on qualified civil liability actions does not deprive courts of subject-matter jurisdiction over such actions. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 127 (2d Cir. 2011). We express no opinion on that issue, which does not affect our conclusion that mandamus relief is appropriate in this case.

distinction was purposeful, as Congress elsewhere has distinguished between a prohibition against bringing a suit or claim and a prohibition against imposing liability. *See, e.g.*, Communications Decency Act, 47 U.S.C. § 230(e)(3) (stating that "[n]o cause of action may be brought *and* no liability may be imposed under any State or local law that is inconsistent with this section" (emphasis added)). The Fourth Circuit likened the immunity conferred by section 230 to "an immunity from suit rather than a mere defense to liability," which is "effectively lost if a case is erroneously permitted to go to trial." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (emphasis removed) (citation and internal quotation marks omitted); *see also Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (interpreting section 230 immunity to "protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles").[16] And as Academy notes, courts have also described other similarly worded federal statutes as providing covered defendants with immunity from suit. *See, e.g.*, *Jackson v. Nat'l Ctr. for Missing & Exploited Children*, No. 19-00607-BAJ-EWD, 2020 WL 4092474, at *2 (M.D. La. July 20, 2020) (holding that defendant NCMEC was "immune from suit" under a statute providing that "a civil claim . . . against NCMEC . . . arising from the . . . functions of NCMEC . . . may not be brought in any Federal or State court").

The plaintiffs primarily rely on cases applying the collateral-order doctrine, a creature of federal procedural law that allows immediate appeal of nonfinal orders in very narrow circumstances, to argue that the PLCAA cannot confer a litigation-defeating immunity because it

---

[16] The court in *Nemet Chevrolet* noted that "[t]here is some disagreement as to whether the statutory bar under § 230 is an immunity or some less particular form of defense for an interactive computer service provider." 591 F.3d at 254 n.4.

contains no "explicit statutory or constitutional guarantee that trial will not occur." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989).[17] The plaintiffs contrast the PLCAA with other federal statutes that contain such an explicit guarantee.[18] However, we have found no cases evaluating the applicability of the collateral-order doctrine to an order denying dismissal under the PLCAA, and several federal decisions interpreting the PLCAA recognize the exact substantive right that the plaintiffs claim is lacking.

For example, in *Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009), the Ninth Circuit reviewed a district court's order dismissing a suit asserting various negligence and nuisance claims against a firearm manufacturer and distributor. The suit, filed by the victims of a mass shooting involving guns manufactured and distributed by the defendants, was pending on the date of the PLCAA's enactment and was dismissed under 15 U.S.C. § 7902(b). The district court described the Act as "provid[ing] immunity to firearms manufacturers and dealers from any lawsuit, pending or otherwise, fitting the Act's definition of a 'qualified civil liability action.'" *Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274, 1283 (C.D. Cal. 2006). The court further noted that such an action "can proceed" only if it falls within one of the Act's exceptions to that definition. *Id.* at 1283–84. In affirming the dismissal order, the Ninth Circuit rejected the

---

[17] To qualify as an appealable collateral order under this doctrine, the order must "(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Midland Asphalt Corp.*, 489 U.S. at 799 (citation and internal quotation marks omitted).

[18] The plaintiffs cite statutes containing language ranging from "shall be immune from liability" to "shall be immune from civil or criminal liability" to "shall be immune from suit" to "shall be immune from suit and liability" to "shall be immune from civil and criminal process" to "shall be immune from any civil action." In doing so, they place unwarranted emphasis on the word "immune" without regard to the surrounding language. To the extent the plaintiffs suggest that statutes referencing only "immunity from liability" confer a "right not to be tried," we disagree. *Cf. Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003) (explaining, in the sovereign-immunity context under Texas law, that immunity from suit "prohibits *suits* against the State unless the State expressly consents," while immunity from liability "protects the State from *judgments*" (emphases added)).

21

plaintiffs' assertion that the PLCAA violated their procedural due process rights by requiring dismissal of their pending suit without an adequate hearing. *Ileto*, 565 F.3d at 1141–42. The court explained that "the PLCAA does not impose a procedural limitation; rather, it creates a substantive rule of law granting immunity to certain parties against certain types of claims. In such a case, the legislative determination provides all the process that is due." *Id.* at 1142 (citation and internal quotation marks omitted).

That description is consistent with the Second Circuit's discussion of the PLCAA in *City of New York v. Beretta*, in which the court held that the PLCAA mandated dismissal of a pending public-nuisance suit against numerous firearm manufacturers and wholesalers for failing to take reasonable steps to inhibit the flow of firearms into illegal markets. 524 F.3d 384, 389–90 (2d Cir. 2008). In addressing the City's constitutional challenges, the court described the PLCAA's impact as follows: "By its terms, the Act bars plaintiffs from courts for the adjudication of qualified civil liability actions, allowing access for only those actions that fall within the Act's exceptions." *Id.* at 397. The PLCAA thus "immunizes a specific type of defendant from a specific type of suit" and "bars the *commencement* or the *prosecution* of qualified civil liability actions." *Id.* at 398 (emphases added); *see also Estate of Kim v. Coxe*, 295 P.3d 380, 388–89 (Alaska 2013) (citing *Beretta* and holding that "Congress's purpose and intent was to bar any qualified civil liability action not falling within a statutory exception").

We find the reasoning of the Second and Ninth Circuits persuasive and consistent with the PLCAA's operative language providing that a qualified civil liability action "may not be brought in any Federal or State court." 15 U.S.C. § 7902(a). Further, the PLCAA as a whole conveys Congress's concern about not only "the effect of civil liability on gun manufacturers,

but also the improper use of the judiciary to circumvent legislative judgments." *Jefferies v. District of Columbia*, 916 F. Supp. 2d 42, 47 (D.D.C. 2013). The *Jefferies* court noted that the Act's requirement of immediate dismissal of actions pending on the date of its enactment "suggests that Congress intended courts to weed out, expeditiously, claims the PLCAA bars." *Id.* That intent is not served by allowing an action barred by the PLCAA to proceed to trial only to be inevitably reversed on appeal, regardless of the procedural device the defendant utilizes to seek dismissal.[19]

Accordingly, we hold that requiring Academy to "proceed[] to trial—regardless of the outcome—would defeat the substantive right" granted by the PLCAA. *In re McAllen Med. Ctr.*, 275 S.W.3d at 465; *see also In re GlobalSanteFe Corp.*, 275 S.W.3d 477, 484 (Tex. 2008) (orig. proceeding) (holding that "mandamus relief is available when the Legislature has enacted a statute to address findings 'that traditional rules of litigation are creating an ongoing crisis,' and 'the purposes of the [enacted] statute would otherwise be defeated'" (quoting *In re McAllen Med. Ctr.*, 275 S.W.3d at 462)) (alteration in original).[20]

---

[19] The plaintiffs' characterization of the PLCAA as merely a "preemption defense" to liability is misplaced. When presented with the kind of federal preemption defense to which the plaintiffs refer, courts must determine whether federal law prevents enforcement of a conflicting state law. *See Tex. Mut. Ins. Co. v. PHI Air Med.*, 610 S.W.3d 839, 842–44 (Tex. 2020) (evaluating whether the federal Airline Deregulation Act preempts the Texas Workers' Compensation Act's reimbursement scheme, mandating higher reimbursement rates than the TWCA otherwise allows). That is, a successful preemption defense "would result only in a change of the applicable law" the court must utilize to resolve the dispute. *See Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 546 (Tex. 1991). By contrast, the PLCAA tells the court when it is (and is not) available as a forum to decide certain disputes under any law. 15 U.S.C. § 7902(a) ("A qualified civil liability action may not be brought *in any Federal or State court*." (emphasis added)). The PLCAA's focus on the court as an available forum, while not necessarily jurisdictional, renders the statute qualitatively different from those that inform the court what law to apply. *Cf. In re Garcia*, No. 13-16-00489-CV, 2017 WL 541120, at *2 (Tex. App.—Corpus Christi–Edinburg Feb. 7, 2017, orig. proceeding [mand. denied]) (mem. op.) (noting that "a choice of law ruling has generally been considered as an incidental ruling for which there is an adequate remedy by appeal").

[20] We recognize that the phrase "may not be brought" is not always and necessarily a declaration of a substantive right to avoid participation in the litigation process. Statutes of limitations, for example, generally

23

Further, while we have held that "an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ," *Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992) (orig. proceeding), we clarified in *Prudential* that a flexible mandamus standard means that in some circumstances "the irreversible waste of judicial and public resources that would be required" absent mandamus relief justifies granting such relief, 148 S.W.3d at 137 (quoting *In re Masonite Corp.*, 997 S.W.2d 194, 198 (Tex. 1999) (orig. proceeding)); *see also CSR Ltd. v. Link*, 925 S.W.2d 591, 596–97 (Tex. 1996) (orig. proceeding) (holding that the "exceptional circumstances" associated with mass tort litigation, including the use of substantial judicial resources and the significant strain imposed on a defendant's resources regardless of the underlying merits, warranted granting mandamus relief even though such relief was typically unavailable from the denial of a special appearance). To that end, in *In re United Services Automobile Ass'n*, we granted mandamus relief from an order denying summary judgment because the specter of a second "wasted" trial on a claim barred by limitations constituted "extraordinary circumstances" meriting "extraordinary relief." 307 S.W.3d at 314.

---

contain such language. *See, e.g.*, TEX. FAM. CODE § 6.109(b) ("A suit may not be brought under this section after the first anniversary of the date of the marriage."). But context is important. The principal purpose of a statute of limitations is to ensure that the opposing party has "a fair opportunity to defend while witnesses are available." *Matthews Constr. Co. v. Rosen*, 796 S.W.2d 692, 694 (Tex. 1990); *see also Godoy v. Wells Fargo Bank, NA*, 575 S.W.3d 531, 538 (Tex. 2019) ("Statutes of limitations are the Legislature's procedural device for establishing a point of repose for past actions and for ensuring that the search for truth is not impaired by stale evidence or the loss of evidence." (citation, internal quotation marks, and alteration omitted)). Such statutes are thus primarily intended to protect the sanctity of the *outcome* of litigation, not to prevent the burdens associated with *participation* in litigation. By contrast, the PLCAA addresses broader concerns about "use of the judiciary to circumvent legislative judgments." *Jefferies*, 916 F. Supp. 2d at 47; *see* 15 U.S.C. § 7901(b)(4) (expressing congressional intent to "prevent the use of [qualified civil liability actions] to impose unreasonable burdens on interstate and foreign commerce").

Moreover, we do not rely solely on the PLCAA's "may not be brought" language to reach our conclusion. As discussed, the statute's express findings and purposes, along with its mandate that all actions pending on the date of its enactment be immediately dismissed, support our determination that the PLCAA "creates a substantive rule of law granting immunity to certain parties against certain types of claims." *Ileto*, 565 F.3d at 1142.

Here, Academy faces multiple trials in the four underlying suits alone, plus multiple additional lawsuits arising from the Sutherland Springs shooting.[21]  Absent mandamus relief, Academy will be obligated to continue defending itself against multiple suits barred by federal law.  As in *United Services*, this case presents extraordinary circumstances that warrant such relief.

### III. Conclusion

We hold that the underlying lawsuits are qualified civil liability actions that the PLCAA bars as a matter of law.  Accordingly, the trial court abused its discretion in denying Academy's motion for summary judgment.  We further hold that Academy lacks an adequate remedy on appeal.  We therefore conditionally grant Academy's petition for writ of mandamus and direct the trial court to grant Academy's summary-judgment motion.  Our writ will issue only if the trial court does not comply.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 25, 2021

---

[21] According to Academy's post-submission brief, a total of nine cases arising from the shooting, involving more than seventy-five plaintiffs, are pending against Academy.